## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF MINNESOTA, | ) ) ) |
| *ex rel.* JILL BACHMANN and SHELLEY MADORE, | ) ) **COMPLAINT** ) |
| Plaintiffs, | ) **FILED UNDER SEAL** ) **PURSUANT TO** ) **FALSE CLAIMS ACT,** ) 31 U.S.C. § 3729 *et seq.* |
| v. | ) ) **JURY TRIAL DEMANDED** ) |
| MINNESOTA TRANSITIONS CHARTER SCHOOLS, ADVANCED ACADEMICS, INC., DEVRY, INC., AND MN VIRTUAL HIGH SCHOOL, | ) ) ) ) CIV. NO. 12-sc-1359 DWF/JSM ) |
| Defendants. | ) ) |

### Introduction

1.     This is a *qui tam* action brought by Relators, Jill Bachmann and Shelley Madore ("Relators"), on behalf of the United States of America and the State of Minnesota, pursuant to False Claims Act, 31 U.S.C. §3729 *et seq* (the "FCA"), as amended, and Minnesota False Claims Act, Minn. Stat. 15C.01, *et seq*.   The false claims at issue were caused by Advanced Academics, Inc. ("AAI"), DeVry Inc. ("DeVry"), Minnesota Transitions Charter Schools ("MTCS"), and MN Virtual High School ("MVHS") (collectively "Defendants") in order to participate in student financial assistance programs authorized under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §1070 *et seq* ("Title IV, HEA programs") and Minnesota student financial assistance programs.   These programs provide student financial

SCANNED
JUN 1 4 2013
U.S. DISTRICT COURT MPLS

6/6/12

DEPUTY CLERK

assistance and reimbursement in the form of, among other things, brick and mortar buildings and general education funding through property tax collections, state general funds and federal grants; and special education funding, in addition to the funds stated above, also through federal medical assistance and school district reserves (cross subsidy).  In particular, charter school funding is procured through state general fund revenues given to the school district, which generally accounts for sixty (60) percent of the cost of services per student and, for special education funding, through an additional forty (40) percent reimbursement by the school district to provide for one hundred (100) percent of cost to deliver special education services. Defendants engaged in fraudulent actions and violations of educational and funding laws in order to obtain eligibility to participate in these financial assistance programs, receive federal and primarily state funds, as well as continue to receive disbursement for services not performed and for non-attending students.

2.      The FCAs provide that any person who submits a false claim to the government is liable for a civic penalty of between $5,500 and $11,000 for each such claim, and for three times the amount of damages sustained by the government.   The Acts permit persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.      Pursuant to 31 U.S.C. §3730(b)(2) and Minn. Stat. 15C.05(d), this complaint must be filed *in camera* and under seal, without service on Defendants. The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

3.      Pursuant to the FCAs, Relators seek to recover on behalf of the United States damages arising from Defendants' knowingly false and/or fraudulent submission of attendance and service records to the state and federal government and for receipt of funds otherwise not entitled

to.   From 2007 through the present, Defendants knowingly submitted, caused to be submitted, and continue to submit and cause to be submitted claims for payment by the state of Minnesota and the United States government based upon these false certifications.

## JURISDICTION AND VENUE

4.      This action arises under the False Claims Act §3729 *et seq*.   This Court has original subject matter jurisdiction over this civil matter pursuant to 28 U.S.C. §§1331 and 1345, as well as 31 U.SC. §3732 (a), which specifically confers jurisdiction on this court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367 and 31 U.S.C. § 3732(b).

5.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a), which authorizes nationwide service of process.   Defendants can be found in, reside in, or have transacted business in the District of Minnesota.

6.      Venue is proper, and this District Court has personal jurisdiction over Defendants, pursuant to 28 U.S.C. §1391(b) and 31 U.S.C. § 3732(a), because Defendants transacts business in this District and Defendants committed acts proscribed by 31 U.S.C. § 3729 in this District.

7.      Relators are an "original source" as defined by the False Claims Act, and no allegations set forth in this Complaint are based on public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing audit, or investigation, or from the news media.   As required by 31 U.S.C. § 3730(b)(2), and the corresponding state statutory requirement, Relator will serve the United States and the State of Minnesota with a written Disclosure Statement providing all material evidence and information they possess that support the allegations in this Complaint.

## PARTIES

8.    Relator Jill Bachmann is a resident of Minnesota.   She was a special education teacher and employed by Defendants from August 23, 2007 to June 14, 2010.   In this role, Relator Bachmann provided on-line educational services for special education students and prepared special education reports outlining program requirements, attendance and performance goals, and expected hours of services.   Based on Relator Bachmann's reports, and those of the other teachers, Defendants received state and federal funds for reimbursement.

9.    Relator Shelley Madore is a resident of Minnesota.   She was an Administrative Coordinator for the Special Education Department for Defendant MVHS from January 19, 2009 to June 14, 2010.   She served as the administrative liaison between Defendant MVHS and MTCS working with both Jim Roth and Tony Scallon.   Relator Madore's role allowed her wide access to enrollment data, reports, Defendants' data related to funding reports submitted to state and federal government contingent on Defendants' representations of student attendance, also known Average Daily Membership or "ADM", student attendance data reports, exam participation reports, Minnesota Automated Reporting Student System (MARSS) data, as well as administrative policies used by Defendants.   During Relator Madore's employment with Defendants, Jim Roth ("Roth") served as Principal of Defendant MVHS.   Since at least 2009, in addition to being appointed principal of Defendant MVHS, Roth was simultaneously Defendant AAI's West Coast Field Operations Manager in charge, among other things, of recruiting students into Defendant AAI's on-line programs, including Defendant MVHS students.

10.    Defendant MTCS operates ten different charter schools in the State of Minnesota, one of which is the on-line Defendant MVHS.   Defendant MTCS schools are free, publicly funded charter schools offering full-time educational opportunities from kindergarten through 12th grade in Minneapolis and Saint Paul.   These full-time schools include:   MTS Elementary, MTS

Banaadir Elementary, Connections Academy, MTS Middle, MTS High School, MN Virtual High School, The Multicultureal Indigenous Academy, and PEASE Academy.   The superintendent of Defendant MTCS is Tony Scallon.   Defendant MTCS is headquartered in Minneapolis, Minnesota and operates under the school code 4017-12.

11.     Defendant AAI is a wholly owned subsidiary of Defendant DeVry, Inc.   Defendant AAI represents that it provides web-based curriculum, highly qualified teachers, a 24/7 support environment, and a proprietary technology platform specifically designed for middle and high school student throughout the United States.   Defendant AAI provided its services to Defendant MTCS, specifically Defendant MVHS, on a contract basis paid for with state and federal tax payer funds.   Defendant AAI's world headquarters are located in Oklahoma City, Oklahoma.

12.     Defendant MVHS is an on-line school offering full-time education to students in Grades 6-12.   Defendant MVHS is a public school funded by taxpayer funds.   Defendant AAI operates Defendant MVHS program and website as well as provides on-line teachers. Defendant MVHS operates under the school code 4017-7.

## FACTUAL ALLEGATIONS

### *DEFENDANTS' CERTIFICATIONS TO THE GOVERNMENT.*

13.     The Minnesota Department of Education ("MDE") regulates oversight and entitlement to funding for charter schools.   In order for a charter school or charter school district to obtain eligibility for funding, the school must enter into a New Charter School Affidavit with the Secretary of Education.   Furthermore, for special education in Minnesota, charter schools are required to employ the services of a licensed director of special education. The director of special education and the school's director complete an annual application and statement of assurances in order to request this funding. The MDE will not allow a charter school to receive this funding

until the application is completed and approved.

14.   In Minnesota, charter schools providing general and special education receive general and special education funding.   The general education revenue program is the primary source of general operating funds for school districts and charter schools and represents a combination of state aid and local property tax revenue.   General education revenue is provided for all public school students in kindergarten through grade 12 and for prekindergarten students with disabilities.   In addition to students attending schools operated by school districts, this includes charter school students; students in grades 11 and 12 attending Minnesota higher education institutions under the Post-Secondary Enrollment Options (PSEO) program; students enrolled in private, nonsectarian schools that have contracted with a public school district to provide educational services (contract alternative); and students attending public schools on a part-time basis while also attending nonpublic schools (shared time).   General education revenue includes several components including basic general education revenue, extended time revenue, gifted and talented revenue, basic skills revenue, sparsity revenue, operating capital, Q-comp revenue, and referendum revenue.

15.   In the case of special education funding, in addition to the funding sources for general education, a charter school providing special education services is entitled to tuition billing. Tuition billing occurs when a district other than the resident district (where a student's parents reside) provides education to a special education student or to any student placed out of district for care and treatment.   The district serving the student is responsible for providing the special education services.   The Minnesota Department of Education Tuition Billing system will calculate rates from UFARS (Uniform Financial Accounting and Reporting System), MARSS (Minnesota Automated Reporting Student System) and EDRS (Electronic Data Reporting

System) data submitted by the districts. The system will calculate tuition invoices for all non-resident students with Individual Education Plans (IEPs). Serving districts will still bill resident districts for students who do not have IEPs in care and treatment in addition to non-Minnesota residents.   Federal funding for special education is based on the number of special education students enrolled in the school, the school's total enrollment, and the school's free and reduced lunch count. The state special education aid is based on the school's special education expenditures and is a percentage reimbursement.

16.     To receive funding, charter schools are required to submit certifications and reports in the MARSS data reports.   These data are used to compute each district's final aid entitlements: August and September MARSS files are used to compute the ADM used for the September 30 and October 30 entitlements, respectively.   For FY 2012, charter schools' final aid entitlements using MARSS data is computed for October 30 only and it uses the September MARSS data. These actual ADM and the aid to which the district or school is entitled are compared to the aid paid to the district or charter school during the school year based on the district's or charter school's ADM estimates provided earlier in the school year.

17.     Pursuant to the MDE, "[d]istricts and charter schools are responsible for verifying the accuracy of these data during the summer and fall reporting season for year-end MARSS data by comparing these ADM figures with reports produced locally.   School staff should ensure that all students have been included in the MARSS file, errors identified in the MARSS WES (Web Edit System) are corrected and new files resubmitted within the established reporting timelines." To receive special education funding, charter schools must enter special education expenditures in an on-line reporting system called Electronic Data Reporting System (EDRS). State special education aid comes to the school in metered payments bi-weekly, along with general education

aid. Federal special education payments are made separately, once a month during the school year. The school must employ or contract with someone to complete this reporting.

18.     Defendants sought and obtained eligibility for funding through MARSS data and EDRS. Defendants were required to comply with a number of federal and state regulations.   Upon information and belief, in fiscal year 2008, Defendant MTCS received $18,853,209, of which $17,311,552 were from the State of Minnesota and $1,078,664 were from the United States government.   Upon information and belief, in fiscal year 2009, Defendant MTCS received $26,712,565, of which $24,892,163 were from the State of Minnesota and $1,078,664 were from the United States government.   Upon information and belief, in fiscal year 2010, Defendant MTCS received roughly $30,239,494.04, of which Defendant MTCS received approximately $23,179,268 from the State of Minnesota and $3,812,525 from the United States government.

19.     Pursuant to Innovative Special Education Services (ISES), which works with Defendants in providing special education services, at least thirteen percent (13%) of all funding received by a charter school or a charter school district is usually allocated to special education.

### MTCS AND AAI STRUCTURE AND MANAGE MVHS TO FACILITATE DEFRAUDING THE UNITED STATES AND MINNESOTA

20.     Defendant MTCS offers on-line education for students in grades 6-12 through Defendant MVHS.   Defendant MVHS holds itself out as a "world-class program" offering a "nationally recognized diploma."   A majority of the students participating in the Defendant MVHS program are students with special education needs.

21.     Defendant MVHS recruits students to participate in its on-line program, through, among other things, state and national televised, radio and printed campaigns and advertising.   At least through the 2009-2010 school year, MVHS offered students a free laptop upon enrollment.

22.     Defendant MVHS is governed by the charter district of Defendant MTCS and operated by Defendant AAI.   Defendant AAI is paid by Defendant MTCS to operate Defendant MVHS program.   Upon information and belief, Defendant AAI received payments from Defendant MVHS on a per pupil enrolled basis.

23.     As stated above, the principal of Defendant MVHS during the time of Relators' employment with Defendants was Roth.   In addition to serving as the Principal of Defendant MVHS, Roth was the West Coast Field Operations Manager for Defendant AAI.   Upon information and belief, Roth held both positions simultaneously.

24.     As the principal of Defendant MVHS, Roth received a salary.   As an employee of Defendant AAI, Roth received compensation based upon the number of students enrolled in the program.

25.     Roth's wife, Ms. Reed Roth ("Ms. Roth") stated to Relator Madore that Roth earned $350,000.00 per year in commission from Defendant AAI.

26.     A significant percentage of the students enrolled at Minnesota Virtual High School were special education students, which are reimbursed at a higher rate than general education students. Although Defendant MVHS received substantially greater funds for these students than general education programs for the other schools in Defendant MTCS' district, Defendant MVHS did not comply with the rigorous and specifically mandated requirements for special education instruction and reimbursement.

### RELATOR SHELLEY MADORE

#### *DEFENDANTS VIOLATED SOCIAL SECURITY REIMBURSEMENT GUIDELINES.*

27.     In the summer of 2009, Relator Madore was approached by a student who demanded that she receive her Social Security benefits as a full-time student.   Relator Madore knew that this

student had not been attending school full-time, and she instructed the student that she would absolutely refuse to sign any paperwork – it would be in violation of the law.   Roth overheard Relator Madore's conversation with the student.   He took the student aside and, in spite of Relator Madore's explaining to him that this was contrary to the law, he signed her paperwork. Upon information and belief, due to Roth's actions on behalf of Defendants, student received benefits she was not entitled to.   Relator Madore believes that this is not an isolated incident.

### DEFENDANTS MANIPULATED ADM AND MARSS DATA TO RECEIVE REIMBURSEMENT FROM STATE AND FEDERAL FUNDS.

28.     As the Administrative Coordinator for the Special Education Department and working closely with Roth, Relator Madore had close knowledge of the operation of Defendant MVHS. Her duties included managing functions related to enrollment, attendance, funding, student assignments and new teacher training.   In addition, her duties included supervision of internal reports for Defendant AAI (student enrollment) and MARSS reports (submitted to MDE).

29.     From the beginning, Madore started noticing a pattern of overzealousness in enrolling students to Defendant MVHS program but a lack of accountability in recording their attendance. This alarmed her.   Madore repeatedly heard the phrase: "was s/he our student as of September 30/October 1" from her supervisors, namely Roth and Scallon.   They explained that Defendant MTCS received final aid entitlement based on ADM data as of September.   Hence, the public campaigns over radio waves, television, on-line and the printed press regarding open enrollment and offering each student enrolling in Defendant MVHS' program a free laptop.

30.     In the fall of 2009, Madore noticed that Defendant AAI representatives were accepting school transcripts and enrolling students directly into Defendant MVHS program.   This she knew to be in violation of enrollment requirements both on the state and federal level.   A student cannot submit his own transcript to enroll; the school itself is required to contact the

registrar's office at student's transferring school and obtain a certified transcript, sealed from the originating school registrar.   In addition, Defendant AAI representatives could most certainly not accept transcripts directly from students – the purpose of their involvement with Defendant MVHS was to provide the on-line program.

31.    In October 2009, Relator Madore wrote an alarming E-mail to Defendant AAI and Defendant MTCS as well as ISES requesting that "AAI stop, immediately, accepting transcripts from students."   Shortly thereafter, she went on a short family trip.   Upon her return to the office, she was transferred to a different location and she no longer had access to the students who were enrolled in violation of state and federal mandates by Defendants.   It was during this time that Ms. Roth told Relator Madore that Roth was paid a commission by Defendant AAI based on the number of students enrolled.   That commission amounted to $350,000 per year (in addition to his base salary as Principal of Defendant MVHS).   Relator Madore's report was not within her scope of duties.   The free laptops provided to students upon enrollment were purchased with tax payer funds.   Upon information and belief, students were not asked to return should they not attend Defendant MVHS program and leave Defendant MTCS district. While enrolled as students of Defendant MVHS, students were provided reimbursement for on-line access to the school program.   This reimbursement was paid through tax payer funds.

32.    Starting in January 2010, Madore started to notice discrepancies in ADM data versus student attendance.   Teachers were reporting to her that students were not attending classes, yet MARSS reports were not being adjusted as required to reflect changes in ADM.   She reported to Defendants' leadership that a lack of truancy policy was unacceptable and unproductive as teachers were requesting that students be reported truant, yet Defendants' leadership was turning a blind eye to the increasing rates in truancy.   On March 17, 2010,

Madore informed Defendants' leadership which included: Jenn Nelson ("Nelson"), Kim Mehlos ("Mehlos"), Scallon, Patty Brostrom ("Brostrom"), and Roth, as well as ISES staff, that they did not have any policy or procedure regarding truant students, nor did they report truant students to the appropriate government authority.   In response, Defendants' leadership stated that this was not an issue.   Furthermore, they removed Relator Madore from her administrative duties regarding MARSS reports and, in her stead, they put in her position Ms. Roth.   This was highly suspect as Roth was paid on a percentage of the ADM reported in the MARSS reports which were not being adjusted for truancy.

33.     In the spring of 2010, Madore also noticed that Defendants' leadership did take action regarding student attendance – but not by reporting students truant when teachers were submitting their data to Defendants.   Instead, she noticed that Roth and particularly Scallon were focused on one specific date – the date in the end of March or April when students would sit for the Minnesota Comprehensive Assessments ("MCA").   From the results of the MCA, the Minnesota Department of Education determines a school's Academic Yearly Performance ("AYP").   If a school's AYP number is too low, then the Minnesota Department of Education can take corrective action, which could include closing the high school.

34.     It was then that Scallon was paying specific attention to MARSS data.   He mandated that MARSS reports be submitted as of the beginning of March – funding would be received later in June for ADM submitted in the March MARSS report.   However, he faced the performance standard dilemma – that is, in order to keep the school district afloat, students must perform to certain academic levels.   But with absentee students not showing up for the test, the AYP score would be low and that would trigger MDE assessment of Defendants.   So, on behalf of Defendants, Scallon instructed that students be dropped for non-attendance shortly before the

exam. And once the exam was completed, in order to meet comparable MARSS data as of March, Scallon instructed that Defendants announce open admission – essentially "re-admitting" the same students that were reported dropped. Any gap in numbers between before and after the exam was therefore mitigated through open enrollment. Defendant MTCS' board minutes for the meeting that occurred on March 18, 2010 included the question, "Are they getting records cleaned up for testing?" "Records clean up" refers to dropping students that were not performing.

35.    On March 23, 2010, Relator Madore notified Mehlos, School Psychologist and Assistant Director at Defendant MVHS of inaccuracies in the student attendance databases and Scallon's actions. These complaints were dismissed as unimportant by Mehlos.

36.    On April 26, 2010, Relator Madore informed Mehlos that students with attendance requirement of 25 hours per week were logging onto the system less than five out of seven days as the school policy required. Mehlos responded that students did not need to log in on five out of seven days each week. None of these reports were within the scope of her duties.

37.    Having been stripped of the majority of her duties and having annoyed Defendants with sounding the alarm as to lack of truancy policy, by complaining repeatedly to Defendants that this caused a host of problems with claiming reimbursement from Federal and State education authorities for students that were not attending, eventually Roth instructed Relator Madore to devise a truancy policy. Relator Madore stated that she lacked the qualification and training to draft a truancy policy. Shortly thereafter, on June 4, 2012, Relator Madore received a notice of non-renewal of her annual contract.

38.    When she attempted to follow the appeal procedures for the non-renewal, Relator Madore was terminated on June 14, 2012 via a letter that accused her of violating student data privacy

laws.   The termination notice was upheld at the June 24, 2010 School Board Meeting, and it was posted in the Defendants' Board Meeting minutes and is accessible on-line through a simple Google search.

### RELATOR JILL nN

***TEACHERS WERE INSTRUCTED TO SUBMIT FALSE INFORMATION FOR FUNDING ON FRAUDULENT INDIVIDUAL EDUCATION PLANS ("IEPs").***

39.     Relator Bachmann was employed as a special education teacher with Defendant MTCS in 2007.   She started working for Defendant MVHS in 2009.

40.     Under the terms of her employment, Relator Bachmann was to spend 40 hours each week as a special education teacher.

41.     As a special education teacher, Relator Bachmann had to create an Individual Education Plan ("IEP") for each of her special education students.   IEPs are in part how schools get funding for special education services.

42.     IEPs are written on an annual basis in compliance with the Individuals with Disabilities Education Act (IDEA).   This plan is written by a committee comprising of teachers, school and district administrators, parents/guardians and any persons who have knowledge of the child that may assist in the process. Basically, the committee looks at the student's present levels of performance and reviews records, medical reports, evaluation data and any other relevant information available to decide upon an appropriate plan.   The plan itself consists of measurable goals and objectives, accommodations, modifications, and, relevant herein, teacher direct and indirect involvement with the student.   In other words, it is a viable plan for a student to achieve academically consistent with his/her medical condition.

43.     The way it is structured, the system calculates tuition invoices for all non-resident students with IEPs.   Serving districts will still bill resident districts for students who do not

have IEPs in care and treatment in addition to non-Minnesota residents.   Federal funding for

special education is based on the number of special education students enrolled in the school, the

school's total enrollment, and the school's free and reduced lunch count. The state special

education aid is based on the school's special education expenditures and is a percentage

reimbursement.

44.     Pursuant to ISES, state and federal special education funds cover approximately half of

the cost of special education. In Minnesota, charter schools are allowed to recover the

unreimbursed costs (those not covered by state or federal special education funds), which are

sometimes called excess costs, by invoicing the special education students' resident school

districts through what was described above as "tuition billing."   A "resident school district" is

the traditional school district within whose boundaries the child's parents live.

45.     Teacher services for special education students are detailed in the IEPs.   Based on the

information included in the IEP, Defendants received reimbursement per the above

guidelines/methodology.

46.     As a special education teacher, Relator Bachmann's responsibilities included creating an

IEP for each of her special education students.

47.     When Relator Bachmann started, Nelson oversaw and Roth supervised her.   Nelson held

the position of special education coordinator.

48.     Prior to Relator Bachmann's employment at Defendant MVHS, the special education

teachers for Defendant MVHS consisted of two part time teachers located in Montana and two

teachers in Minneapolis.   One of these part time teachers had over 350 students.

49.     On behalf of Defendants, at a meeting held in the fall of 2009 with special education

teachers of Defendant MVHS, Scallon instructed special education teachers to flatly report one

(1) hour of *direct* student contact and one (1) hour of *indirect* student contact for each IEP per week.

50.     Relator Bachmann stated at that meeting that that request was simply impossible and a misrepresentation of teacher work for at least two reasons: (1) most students did not *require* that allocation of time based on their education needs; and (2) it was simply an impossibility as the average student load assigned per teacher was between 37 and 39 students.   As such, for a teacher like Relator Bachmann working 40 hours a week, serving two (2) hours for each student (1 direct and 1 indirect) was an impossibility.   The same applied to most other teachers.

51.     On September 22, 2009, Relator Bachmann complained to the Special Education Monitor for the MDE that IEPs requiring one (1) hour of direct and one (1) hour of indirect interaction with special education students per week were completely unrealistic.   There were simply too few teachers and too many students to be able to provide these services.   She was told that if she wished to pursue her complaint further, in order for the MDE to undertake an investigation, it would need to identify Relator Bachmann as the complaining party.   She was not afforded anonymity.

52.     Faced with MDE's shrug, Relator Bachmann told Scallon that she refused to lie on the IEPs.

53.     In the spring of 2010, Mehlos told Relator Bachmann, again, that she needed to report one hour of direct and one hour of indirect contact with students, and that her IEP numbers were low.   She stated that she would not report fraudulent information on the IEPs.

### DEFENDANT MVHS VIOLATED IEP REQUIREMENTS FOR PARTICIPANTS REQUIRED IN IEP MEETINGS.

54.     In addition to her reports on fraudulent representations on IEPs contrary to the reality of teacher involvement with students, Relator Bachmann complained to Defendants' leadership that Defendant MVHS did not have all the required participants at the IEP meetings.

55.     Although not within the scope of her duties, Relator Bachmann stated to Defendants' leadership that state and federal law, and specifically Part B of the Individuals with Disabilities Education Act ("IDEA"), required the participation of a district representative, a special education case manager, a general education teacher that teaches the student, parents, and students over 14 years old, and a related service provider, if applicable.

56.     In response, Relator Bachmann was instructed to list and use Ms. Roth as the general education teacher in her IEPs and for her IEP meetings.   Ms. Roth has a Physical Education license and did not work with the students directly.   Relator Bachmann objected to using Ms. Roth for this purpose, citing that it was against state law to do so.   Upon information and belief, all other teachers utilized Ms. Roth in this role.

57.     On June 4, 2010, Relator Bachmann received notice that her contract would not be renewed starting in August 2010.   She appealed the decision for final action by Defendants' Board.   On June 24, 2010, Defendants' Board affirmed the Notice of Non-Renewal.

58.     On June 14, 2010, Relator Bachmann received a termination notice.   The termination notice was upheld at the June 24, 2010, School Board Meeting.   As with Relator Madore, it was posted in Defendants' Board Meeting minutes.

## COUNT I   - FEDERAL FALSE CLAIMS ACT
### VIOLATION OF 31 U.S.C. §3729(a)
### prior to and after the amendment enacted on May 20, 2009

59.     Relators incorporate, restate and reallege the allegations stated in the previous

paragraphs.

60.     This count sets forth claims for treble damages and forfeitures under the federal False

Claims Act, 31 U.S.C., §§3729-3732.

61.     Under the False Claims Act, 31 U.S.C., § 3729(a), in effect prior to May 20, 2009,

Defendants have violated:

(a)     31 U.S.C. §3729(a)(1) by knowingly presenting, or causing to be presented, to an

officer or employee of the United States Government or a member of the Armed Forces of the

United States a false or fraudulent claim for payment or approval;

(b)     31 U.S.C. §3729(a)(2) by knowingly making, using, or causing to be made or

used a false record or statement to get a false or fraudulent claim paid or approved by the

government; and/or

(c)     31 U.S.C. §3729(a)(3) by conspiring to defraud the Government by getting a false

or fraudulent claim allowed or paid.

62.     Under the False Claims Act, 31 U.S.C. 31 U.S.C. §3729(a)(1) as amended on May 20,

2009, Defendants have violated:

(a)     31 U.S.C. §3729(a)(1)(A) by knowingly presenting, or causing to be presented, a

false or fraudulent claim Defendants knowingly presented requests to the United States

Government for reimbursement based on student enrollment and performance.

(b)     31 U.S.C. §3729(a)(1)(B) by knowingly making, using, or causing to be made or

used a false record or statement material to a false or fraudulent claim; and/or

(c)     31 U.S.C. §3729(a)(1)(C) by conspiring to commit a violation of subparagraph

(A) or (B).

63.     The United States, unaware of the falsity of the claims, approved, paid and participated in

payments made by the United States for claims that otherwise would not have been allowed.

64.     By reason of Defendants' false claims, the United States has been damaged, and possibly

continues to be damaged.

**COUNT II   - FEDERAL FALSE CLAIMS ACT**
**VIOLATION OF THE REVERSE FALSE CLAIMS ACT, 31 U.S.C. §3729(a)**
**prior to and after the amendment enacted on May 20, 2009**

65.     Relators reallege and incorporate by reference the allegations of paragraphs 1-58 of this

complaint.

66.     Through the acts described above, Defendants and their agents, and employees

intentionally and knowingly failed to report students who should have been dropped from

Defendants' schools due to attendance violations, or who were improperly enrolled into

Defendants' programs, as well as submitted false claims for teacher student participation in

violation of federal law requirements, in order to "conceal, avoid or decrease" an obligation by

Defendants to return federal funding to the government.

67.     Under the False Claims Act 31 U.S.C. §3729(a) in effect prior to May 20, 2009,

Defendants have violated 31 U.S.C. §3729(a)(7) by knowingly making, using, or causing to be

made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or

transmit money or property to the government.

68.     Under the False Claims Act 31 U.S.C. §3729(a) as amended on May 20, 2009,

Defendants have violated 31 U.S.C. §3729(a)(1)(G) by knowingly making, using, or causing to

be made or used, a false record or statement material to an obligation to pay or transmit money

or property to the Government, or knowingly concealing or knowingly and improperly avoiding

or decreasing an obligation to pay or transmit money or property to the Government.

69.     Defendants' fraudulent concealment and intentional failure to report students who should

have been dropped from Defendants' schools due to attendance violations, or who were improperly enrolled into Defendants' programs, as well as report false claims for teacher student participation in violation of federal law requirements in order to avoid refunding federal money in the form of federally granted loans constitutes an unlawful avoidance of an obligation to pay money owed to the United States.

70.     Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

## COUNT III   - MINNESOTA FALSE CLAIMS ACT

### VIOLATION OF MINN. STAT. §15C.01

71.     Relators incorporate, restate and reallege the allegations stated in the previous paragraphs.

72.     Through the acts described above, Defendants, their agents, and employees intentionally and knowingly presented claims for money, grant requests and requests for reimbursement for students who should have been dropped from Defendants' schools due to attendance violations, or who were improperly enrolled into Defendants' programs, as well as submitted false claims for teacher student participation with actual knowledge of the falsity of the information submitted, in deliberate ignorance of the truth or falsity of the information, and/or in reckless disregard of the truth or falsity of the information in violation of Minn. Stat. 15C.01, Subd.3(1)-(3).

73.     Defendants use of false records caused the government to pay funds that it normally would not have paid had the records not be falsified in violation of Minn. Stat. 15C.01 *et seq.*

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs/Relators request that judgment be entered against Defendants,

ordering that:

A.    Defendants cease and desist from violating the Federal False Claims Act;

B.    Defendants cease and desist from violating the Minnesota False Claims Act;

C.    Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions;

D.    Defendants pay an amount equal to three times the amount of damages Minnesota State government has sustained because of Defendants actions;

E.    Defendants pay maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States government and the Minnesota State government;

F.    Plaintiffs/Relators be awarded the maximum amount allowable pursuant to the Federal False Claims Act and the Minnesota False Claims Act;

G.    Plaintiffs/Relators be awarded all costs of this action, including attorneys' fees, expenses, and costs;

H.    For the Fourth, Fifth, Sixth and Seventh Cause of Action against Defendants, for back pay, front pay, mental anguish and suffering and punitive damages; and

G.    United States, State of Minnesota and Plaintiff/Relators be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relators, on behalf of themselves and the United States and the State of Minnesota, hereby demand a trial by jury.

Dated this 6 day of June

**BAILLON THOME JOZWIAK MILLER & WANTA, LLP**

Bryce M. Miller (#386901)
Christopher D. Jozwiak (#386797)
222 South Ninth Street
Suite 2955
Minneapolis, MN   55402
Telephone:     (612) 252-3570
Facsimile:     (612) 252-3571

**HARTZHEIM LAW OFFICE, PLLC**

Ani Backa Hartzheim (#334388)
900 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 455-1047

**ATTORNEYS FOR RELATORS**