## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| United State of America, et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>Minnesota Transitions Charter School, et al.,<br><br>     Defendants. | Civil File No. 12-cv-01359 (DWF/JSM)<br><br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS MINNESOTA TRANSITIONS CHARTER SCHOOL AND MINNESOTA VIRTUAL HIGH SCHOOL'S MOTION TO DISMISS** |

## INTRODUCTION

This qui tam suit seeks damages for "fraudulent submission of attendance and service records to the state and federal government and for receipt of funds otherwise not entitled to." Plaintiffs' Complaint Par. 3 (hereinafter "Pl. Comp. ¶__"). The suit is brought under both the Minnesota False Claims Act ("MFCA", Minn. Stat. §15C.01 et. seq.) and the Federal False Claims Act (31 U.S.C. §3730). Plaintiffs are two former employees of Defendant Minnesota Transitions Charter School, a charter school district, which operates a full time on-line school program known as the "Minnesota Virtual High School" (MVHS). At all times material to this matter, MTCS and Defendant Advanced Academics[1] had a contract in which Advanced Academics provided the "educational programming, teachers and administrative support" to MTCS.

**The Claims**

    Plaintiffs' claims under the MFCA are based solely on the following allegations:

---

[1] A wholly owned subsidiary of DeVry University, also named as a defendant in this matter.

1.      That Defendants inappropriately enrolled students at MVHS by accepting transcripts directly from students. (Pl. Comp. ¶¶29-32)  (the "transcripts" claim);

2.      That Defendants provided "free laptops" to students upon enrollment and such laptops were purchased with tax payer funds. (Pl. Comp. ¶31) (the "laptop" claim);

3.      That that attendance reports were "not being adjusted for truancy". (Pl. Comp. ¶¶29-32)  (the "truancy" claim); and

4.      That Defendants dropped low-performing students from enrollment before tests and then re-enrolled them after tests.  (Pl. Comp. ¶34) (the "dropped students" claim).

Based on nothing more than these allegations, Plaintiffs conclude that Defendants "present[ed] claims for money, grant requests and requests for reimbursement for students who should have been dropped from Defendant's schools due to attendance violations, or who were improperly enrolled into Defendants' programs" and conclude that Defendants therefore violated Minn. Stat. §15C.01, subd. 3(1)-(3). (Pl. Comp. ¶72). Plaintiffs further assert that "Defendants (sic) use of false records caused the government to pay funds that it normally would not have paid had the records not be (sic) falsified in violation of Minn. Stat. §15C.01, subd. 3(1)-(3)".   However, 1) there is no specific allegation that any "claim" was submitted to the State of Minnesota; 2) there is no allegation that such claims, if presented, were false; and 3) there are no specific

allegations of fact regarding the use of "false records" in the submission of these unspecified claims.

Plaintiffs assert three separate sets of facts in support of the Counts I and II of the Federal False Claims Act claims. They are:

1. That Defendants directed Plaintiff Bachman to report inaccurate data pertaining to service minutes on students' Individual Education Plans. (Pl. Comp. ¶¶49-50; 55-56) (the "IEP" claim);

2. That sometime in 2009 Plaintiff Madore declined to sign the "paperwork" of a student confirming that he or she was eligible for social security benefits but that Jim Roth, an employee of both MVHS and Advanced Academics, did sign the "paperwork". (Pl. Comp. ¶27) (the "paperwork" allegation); and

3. That MVHS allowed a physical education teacher, who did not work directly with students, to attend IEP tem meetings. (Pl. Comp. ¶ 56) (the "team meeting" allegation).[2]

---

[2] While Plaintiffs make unsupported and vague claims of misconduct beginning after their terminations through the present time (Pl. Comp. ¶3), absolutely no facts were presented to support the claims. "Because the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b)." *United States ex Pl. Joshi v. St. Luke's Hosp., Inc*., 441 F.3d 552, 556 (8th Cir. 2006). Rule 9(b) requires that a party "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Thus, demanding a higher degree of notice, Rule 9(b) requires that the complaint plead 'such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result'." *USA, ex Pl. Michael Dunn v. North Memorial Health Care,* Case No:13-1099 (Eighth Circuit, Jan. 9, 2014) citing

As was true with the MFCA claims, there are no facts substantiating the assertion that any "claim" was submitted to the United States Government; 2) there is no allegation that a claim, if submitted, was false; 3) there are no specific allegations of fact regarding the use of "false records" in the submission of these claims; 4) there are no allegations of fact supporting the claim of a "conspiracy" amongst the defendants; and 5) there are no allegations of fact supporting the assertion that somehow these acts "improperly avoid[ed] or decreas[ed] an obligation to pay or transmit money or property to the Government".

## STANDARD OF REVIEW

Motions for judgment on the pleadings under Rule 12(b) of the Federal Rules of Civil Procedure challenge the legal sufficiency of the claims asserted in the complaint. "For purposes of the motion, the allegations of the non-moving party must be accepted as true. Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990) (internal citations omitted).

---

*Joshi*, *supra,* 441 F.3d at 556.  No such facts were pled with regard to the events occurring after Plaintiffs were terminated.

Under Federal Rule of Civil Procedure 8(a), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 566 U.S. 662, 663 (2009). Even under the liberal pleading standard of Rule 8(a), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286, (1986)). Pursuant to *Twombly*, a plaintiff must not merely allege conduct sufficient to state a conceivable claim, but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 1566 U.S. 662, 663 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal citation and quotation marks omitted).

In the present matter, MTCS and MVHS are entitled to dismissal of Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure based on the MFCA because 1) the actions complained of pre-date the effective date of the MFCA, and 2) charter schools are immune from liability under the plain terms of the MCFA.

MTCS and MVHS are also entitled to dismissal of all of Plaintiffs' claims under Rule 12(b)(6) because the Complaint does not set forth the allegations which, even if taken as true, state a claim for relief under either state or federal law.

Finally, the Federal False Claims Act counts should be dismissed under Rule 12(b) because Minnesota's charter schools are instrumentalities of the state immune from liability under the Eleventh Amendment and because Minnesota charter schools are not "persons" within the meaning of the Federal False Claims Act

## ARGUMENTS

I. **PLAINTIFFS' COMPLAINT AGAINST DEFENDANTS MINNESOTA TRANSITIONS CHARTER SCHOOL AND MINNESOTA VIRTUAL HIGH SCHOOL (MTCS[3]) DOES NOT STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED UNDER THE MINNESOTA FALSE CLAIMS ACT**

A. The Acts Complained of Pre-Date the Enactment of Minnesota's False Claims Act (MFCA).

As has been fully briefed in the December 16, 2013 Memorandum in Support of Motion to Dismiss filed by Defendants DeVry and Advanced Academics, Inc., Plaintiffs' Complaint fails to state a claim on which relief can be granted because all of the conduct being complained of pre-dated the enactment of Minnesota's Fair Claims Act (MFCA). Plaintiffs' Complaint must therefore be dismissed in its entirety with regarding to the MFCA.

B. The State and All of Its Political Subdivisions are Immune from Liability under Minnesota's False Claims Act.

---

[3] Because Minnesota Virtual High School is a program operated by Minnesota Transitions Charter School and is not a separate entity, both will be referred to as "MTCS".

A waiver of sovereign immunity "must be unequivocally expressed in statutory text." *Lane v. Pena*, 518 U.S. 187, 192, 116 S. Ct. 2092, 2096 (1996). Furthermore, in determining whether immunity has been waived, "[a]ny ambiguities in the statutory language are to be construed in favor of immunity. . . so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." *F.A.A. v. Cooper*, 132 S. Ct. 1441, 1448 (2012). "In both the Minnesota and the federal systems, immunity from suit is an issue 'that our constitutional system of separation of powers assigns to the legislative branch to decide as a matter of public policy'." *Nichol v. State of Minnesota, Ct. File No. 62-CV-12-7326, Minn. Ct. App., January 21, 2013; see also Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 544 (2002).

In the present case, the Minnesota legislature has clearly signaled its intent to broadly immunize itself and all "political subdivisions" in the State from liability under Minnesota's False Claims Act (MFCA). A charter school is part of the state's system of public education, Minn. Stat. §124D.10 subd. 7, and is a public entity created pursuant to a legislative grant of authority. *See* Minn. Stat. §124D.10 generally. Thus, it is entitled to the same broad grant of immunity as that enjoyed by the State and similar governmental entities, such as political subdivisions, created by legislative authority. Therefore, all of Plaintiffs' claims against MTCS based on the Minnesota law must be dismissed.

II.   **PLAINTIFFS' COMPLAINT DOES NOT STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED BECAUSE THERE ARE NO FACTS PLAUSIBLY SHOWING THAT THE   ACTIONS COMPLAINED OF WERE "FALSE CLAIMS" UNDER STATE OR FEDERAL LAW**

In order to state a claim upon which relief can be granted under either the Federal FCA, Plaintiffs must allege that the defendants 1) made a claim or caused a claim to be made against the United States; 2) that the claim was false or fraudulent; and 3) that the defendants knew the claim was false or fraudulent.  31 U.S.C. §3730.

A.    <u>Plaintiffs Cannot Plausibly Show That "False Claims" Were Submitted to the State of Minnesota Based on the Actions Alleged</u>.

1.    Transcripts Allegation.

Plaintiffs claim that somehow a fraudulent claim resulted from a chain of events beginning with Defendants' "illegal" acceptance of student-delivered transcripts. However, there is no state or federal law that prohibits students from accessing their transcripts and submitting them to a school for purposes of enrollment.  In fact, under Minnesota law a charter school must admit students whether or not a transcript is provided as long as an application is "timely submitted".  *See* Minn. Stat. §124D.10 subd. 9(b).  Because it is legal to enroll a student with or without a transcript, there is no plausible way in which a false claim could have been submitted to the State of Minnesota based on the facts alleged.

2.    Laptop Allegation.

Plaintiffs seem to be suggesting that MTCS inappropriately used the inducement of a "free laptop" in an effort to get students to enroll.  However, because the program at MVHS in totally online, students need a computer in order to access the program. Minnesota's Public School Fee law states that a charter school or traditional school "is not authorized to charge fees…for supplies necessary for participation in any

instructional course….".   A computer is obviously a supply necessary for participation in an online course.  Thus, providing the computer (in this case a laptop) is actually consistent with the requirements of Minnesota law.[4] *See also* http://education.state.mn.us/MDE/StuSuc/EnrollChoice/Online/OnlineLearningProviders/ 046861.

Because MTCS is required to provide supplies necessary for students to participate in the instructional courses the school offers, there is no plausible way in which a false claim could have been submitted to the State of Minnesota based on the facts alleged.

      3.      Truancy Allegation.

Plaintiffs suggest that MTCS illegally collected state aid for students when they were not attending class.  However, because the program at MVHS is an online program, "physical attendance" is an irrelevant measurement of student participation.   The Minnesota Department of Education does not calculate state aid and reimburse MVHS based on student attendance, but rather on whether a student *actually completes a course* by submitting the required assignments and passing the appropriate exams.  *See* Minn. Stat. §124D.095 subd. 8.[5] If a student does not successfully take and complete the course,

---

[4] The other allegation, made on information and belief, is that the laptops are not collected back from students if they leave the school.  Even if true (and the allegation is in no way conceded), failure to recover the laptop is not tantamount to submission of a false claim.

[5] That section provides: Subd. 8. **Financial arrangements.**
  (a) For a student enrolled in an online learning course, the department must calculate average daily membership and make payments according to this subdivision.

MVHS does not receive aid for the student. Since physical attendance is irrelevant to MVHS' receipt of state aid, there is no plausible way in which a false claim could have been submitted to the State of Minnesota based on the facts alleged.

                4.        Dropped Student Allegation.

As was true of the truancy allegation, the fact that an online student is dropped from enrollment and then re-enrolled—regardless of the reason[6]- does not result in the payment of funds from the State.  Again, payment is based on courses completed- not who attended courses over what period of time. Thus, there is no plausible way in which the alleged enrollment practice could have resulted in the submission of a false claim for payment of funds to the State of Minnesota.

           B.        <u>Plaintiffs Cannot Plausibly Show that False Claims Were Submitted to the Federal Government Based on the Actions Alleged.</u>

                1.        IEP Claim.

Plaintiffs alleged that MTCS Superintendent directed Ms. Bachman to list a certain number of minutes as "direct service" in a student's IEP. However, no facts are

---

(b) The initial online learning average daily membership equals 1/12 for each semester course or a proportionate amount for courses of different lengths. The adjusted online learning average daily membership equals the initial online learning average daily membership times .88.

(c) No online learning average daily membership shall be generated if: (1) *the student does not complete the online learning course,* or (2) the student is enrolled in online learning provided by the enrolling district. (Emphasis added).

[6] MTCS is not asserting that it is good educational policy to suggest that low-performing students should be dropped from enrollment and in fact, disputes that this practice occurred.  The point is not whether it is good or bad, or whether it occurred.  The point is whether the practice, if it occurred, constituted submission of a false claim.

asserted that plausibly link the contents of a student's IEP to a "claim" to the federal government.

### 2.   Paperwork Claim.

Plaintiffs assert that sometime in 2009, Plaintiff Madore declined to sign the "paperwork" of a student confirming that he or she was eligible for social security benefits but that Jim Roth, an employee of both MVHS and Advanced Academics, did sign the "paperwork". However, Plaintiffs have not alleged any facts about the "paperwork", including 1) whether it was even a document that would be submitted to the government; 2) information confirming or even suggesting that the student in question was ineligible to receive the benefits; 3) information that Mr. Roth knew the student was ineligible; and 4) information that a claim of any kind was ever submitted.

### 3.   Team Meeting Claim.

Finally, Plaintiffs assert that MTCS allowed a physical education teacher to attend team meetings for special education students when that teacher did not work directly with students. First, there is no requirement that every teacher who attends a special education team meeting work directly with students.  34 C.F.R. §300.321 provides:

> General. The public agency must ensure that the IEP Team for each child with a disability includes--
> (1) The parents of the child;
> (2) Not less than one regular education teacher of the child (if the child is, or may be, participating in the regular education environment);
> (3) Not less than one special education teacher of the child, or where appropriate, not less than one special education provider of the child;
> (4) A representative of the public agency who--

(i) Is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

(ii) Is knowledgeable about the general education curriculum; and

(iii) Is knowledgeable about the availability of resources of the public agency.

(5) An individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in paragraphs (a)(2) through (a)(6) of this section;

(6) At the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and

(7) Whenever appropriate, the child with a disability.

More important, as is true with all the other allegations contained in the Complaint, there is no statement that the attendance of this individual resulted in the submission of a false claim to the federal government.

The Complaint is completely devoid of facts which, if proven, would plausibly demonstrate the submission of a claim to either the state or federal government, much less a false or fraudulent claim. As such, the Complaint fails to state a claim on which relief can be granted.

## III. MINNESOTA CHARTER SCHOOLS ARE ENTITLED TO ELEVENTH ADMENDMENT IMMUNITY

The Eleventh Amendment to the United States Constitution provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State". U.S. Const. amend. XI "It is clear

that the Eleventh Amendment prohibits actions for damages against state agencies when Congress has failed to express a contrary intent". *See Ataascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (congressional intent to override the principles of sovereign immunity embodied in the Eleventh Amendment must be 'unmistakably clear').

*Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977) was the seminal Supreme Court opinion concerning whether Eleventh Amendment Immunity would extend to include school districts.  The Court began by noting that "[t]he bar of the Eleventh Amendment to suit in federal courts extends to State and state officials in appropriate circumstances", but went on to note that the same immunity does not extend to "counties and similar municipal corporations".  *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977) citing *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890) and *Moor v. County of Alameda*, 411 U.S. 693, 717-721 (1973).  "The answer depends, at least in part, upon the nature of the entity created by state law."  *Mt. Healthy, supra.*

In concluding that the school district in *Mt. Healthy* was more akin to a county or municipality, the Court considered the fact that the definition of "State" under Ohio excluded political subdivisions, and that school districts were defined as political subdivisions.  The Court also noted that the school districts were subject to "some guidance" from the Ohio State Board of Education and received a significant amount of money from the State.  But the Court also found significant the fact that "local school boards have extensive powers to issue bonds, and to levy taxes…".  The Court concluded

by holding that "[on  balance, the record before us indicates that a local school board [under Ohio law]... is more like a county or city than it is like an arm of the State".

A.   Minnesota's Charter Schools Meet Virtually Every One of the "Arm of the State" Factors Articulated by the Eighth Circuit.

Since *Mt. Healthy* was decided, virtually all federal circuit courts, including the Eighth Circuit, have established their own tests to determine whether an entity is an arm of the state or is more akin to a local unit of government.  The Eighth Circuit has specifically held that when construing immunity for purposes of the Eleventh Amendment, courts must carefully examine the particular circumstances of each entity to determine whether the suit is in reality against an "arm or alter ego of the state". *Greenwood v. Ross,* 778 F.2d 448, 453 (8th Cir. 1985); *Sherman v. Curators of Univ. of Mo.,* 16  F.3d  860,  863  n.3  (8th  Cir.  1994).  The Eighth  Circuit  in *Sherman*  approved  of  the  nine  factors  identified  in *Kovats  v.  Rutgers,  The  State Univ.,* 822 F.2d 1303, 1309 (3d Cir. 1987), for use in evaluating an entity's status under the Eleventh Amendment.  Those nine factors are:

> (1) local law and decisions defining the status and nature of the agency involved in its relation to the sovereign; (2) *most importantly, whether the payment of the judgment will have to be made out of the state treasury*; (3) whether the agency has the funds or the power to satisfy the judgment; (4) whether the agency is performing a governmental or proprietary function; (5) whether it has been separately incorporated; (6) the degree of autonomy over its operations; (7) whether it has the power to sue and be sued and to enter into contracts; (8) whether its property is

14

immune from state taxation; and (9) whether the sovereign has immunized itself from responsibility for the agency's operations.[7]

*Sherman,* 16 F.3d at 865 n.6 (emphasis added).

Careful consideration of each of these nine factors clearly demonstrates that MTCS, as a part of the state's system of public education, is immune from suit in federal court under the Eleventh Amendment.[8]

1.   Local law and decisions defining the status and nature of the agency involved in its relation to the sovereign.

The enabling legislation for Minnesota's charter schools law clearly indicates that charter schools are "instrumentalities of the state" and are not autonomous units of local government such as cities, counties and school districts. Minnesota's charter school law specifically refers to charter schools as "…part of the state's system of public education".

---

[7] Not all circuits consider these nine factors.  For example, the Ninth Circuit considers five factors originally set forward in *Mitchell v. Los Angeles Community College Dist.*, 861 F.2d 198, 201 (9th Cir. 1988).

[8] In *ACLU v. Tarik ibn Ziyad Academy,* 2010 WL 1840301(D. Minn. 2010), the Federal District Court for the District of Minnesota ruled that the charter school in question was not entitled to Eleventh Amendment immunity in regard to Plaintiff's Section 1983 claims.  In making its determination, the Court found that because school districts are defined as "municipalities" and because Minnesota statutes define charter schools as "school districts" for purposes of tort liability, charter schools are therefore "municipalities".   However, in coming to this conclusion, the court did not have to consider many of the nine *Sherman* factors, including the most important "arm of the state" factor: whether the school would have to use state funds to satisfy a judgment. The court did not have to rule on the fiscal impact of a judgment against a charter school because plaintiff's claims were not for prospective monetary relief but rather sought restitution of funds already advanced by the state.  For all of these reasons, MTCS respectfully urges this court to apply all of the nine *Sherman* factors to the case now before it and determine whether charter schools in Minnesota are entitled to Eleventh Amendment immunity.

Minn. Stat. §124D.10 subd. 7. Furthermore, charter schools are not to be characterized or treated as school districts.  Unless a statute applicable to school districts is made specifically applicable to charter schools, "[a] charter school is exempt from all statutes and rules applicable to a school, school board, or school district unless a statute or rule is made specifically applicable to a charter school or is included in this section".

> 2.      Payment for any judgment would have to come from the state treasury if the judgment exceeded the school's operating and reserve funds.

The United States Supreme Court in *Hess v. Port Authority Trans-Hudson Corp*., 513 U.S. 30 (1994), characterized the question of whether the state will satisfy the judgment out of its funds as "the most salient factor in Eleventh Amendment determinations." *Id*. at 48.  A discussion of laws pertaining to charter school revenue and structure is instructive on this point.

First, virtually all of the revenue charter schools receive comes from the treasury of the State of Minnesota.  Charter schools receive general education aid (Minn. Stat. §124D.11 subd. 1), transportation aid (Minn. Stat. §124D.11 subd. 2), building lease aid (Minn. Stat. §124D.11 subd. 3), special education revenue (Minn. Stat. §124D.11 subd. 4), and other general aid grants and revenue (Minn. Stat. §124D.11 subd. 6) from the state.[9]  Thus, whenever a judgment is rendered against a charter school, unless the

---

[9] While some monies are received from other school districts in the form of special education tuition reimbursements, and others are received from the federal government, all government funds received by charter schools must be used for the purposes specified in the original funding legislation and cannot be diverted to general operating revenue uses or payment of judgments. *See* Minnesota's Uniform Financial Accounting and

judgment is covered under an insurance policy, the judgment is paid for with money that has been received from the state treasury.

Second unlike traditional public schools and other local units of government, charter schools are prohibited from levying taxes.  Minn. Stat. §124D.10 subd. 25 (b) provides that a charter school board "…may not levy taxes or issue bonds".

Counties, cities and traditional school districts in Minnesota can use their levy power to satisfy judgments rendered against them.  *See* Minn. Stat. §475.51.  However, because charter schools lack this power, a judgment against a charter school could not be satisfied by resort to levying taxes at the local level.

Third, unlike a traditional school district, if a judgment under the FCA were rendered against MTCS, and MTCS was not able to pay for the judgment out of its general operating and/or reserve funds, the school would most likely closed by either the Commissioner of Education or by the school's authorizer and the school's corporate status would be dissolved.  *See* Minn. Stat. §124D.10 subd. 23.   Whatever funds the school had at the time of dissolution would be distributed as follows:  (1) distribution of assets received and held for a special use or purpose (such as specific bequests); (2) payment of costs and expenses of the dissolution proceedings, including attorney fees and disbursements; and (3) payment of debts, obligations, and liabilities of the corporation. *See* Minn. Stat. §317A.735 subd. 1 and Minn. Stat. §124D.11 subd. 9 (g).  If the school owed the state money (for example, if the state had over-advanced aid to the school), then

---

Reporting Manual, available at:
http://education.state.mn.us/MDE/SchSup/SchFin/FinMgmt/UFARS/.

the funds that would otherwise have reverted to the State of Minnesota would be diverted to pay the Plaintiffs and the US Government. *See* Minn. Stat. §124D.11 subd. 9(g). Thus in very real terms, the judgment for a false claims act award would be satisfied by funds coming out of the State treasury—whether because charter schools are funded almost entirely by state monies or because a judgment resulting in dissolution would diminish if not extinguish money that would otherwise be returned to the State treasury. And finally, unlike the dissolution of a non-profit corporation, if there were any money remaining after satisfying all a charter school's debts, that money must be returned to the state treasury—again indicating that the State itself considers a charter school's funds to be state funds. Minn. Stat. §124D.11 subd. 9(g). From original funding through dissolution, the funds used by charter schools, and the funds used to satisfy judgments levied against charter schools, are state funds.

> 3.     Whether the agency has the funds or the power to satisfy the judgment.

As discussed above, unlike a traditional school district, a county or a city that has the power to levy taxes to satisfy a judgment, charter schools have no levy authority and no authority to issue bonds. *See* Minn. Stat. §124D.10 subd. 25(b). Since there would be no independent power to satisfy a judgment entered in this matter, it would have to come from the funds of the school which in turn come from the State's treasury.

> 4.     Whether the agency is performing a governmental or proprietary function.

There can be no argument about the fact that as a public school district, a charter school is performing a constitutionally mandated governmental function: providing

education as part of the state's system of public education. *See Skeen* v. *State of Minnesota,* 505 N.W.2d 299 (Minn. 1993): "[t]he Education Clause not only contains language such as 'shall' but in fact places a 'duty' on the legislature to establish a 'general and uniform system' of public schools."

     5.     Whether it has been separately incorporated.

While they are required to be structured as non-profits for purposes of formation and dissolution, (*see* Minn. Stat. §124D.10 subd. 4 (b)), the comprehensive regulatory provisions of the charter school law clearly indicate that the schools are most essentially part of the state's system of public schools. For example, charter schools, unlike non-profit corporations require specific approval from Commissioner of Education before they can operate. *See* Minn. Stat. §124D.10 subd. 4(b). Charter schools, unlike non-profit corporations, can be forced to cease operations by either the Commissioner of Education or by the school's authorizer. *See* Minn. Stat. §124D.10 subd. 23. Furthermore, the Board of a charter school must comply with the stringent requirements of the Charter School Law's conflict of interest provisions—which are much more circumscribed than those contained in the laws applicable to non- profit corporations. *Compare* Minn. Stat. §124D.10 subd. 4(a) and Minn. Stat. §317A.255. In fact, to the extent that the Charter School Law conflicts with provisions of Minnesota's Non-Profit Law, the charter school law governs. *See* Minn. Stat. §124D.10 subd. 4(b).

     6.     The degree of autonomy over its operations.

When the original charter school legislation passed, it was hailed as a way to free charter schools from the shackles of traditional public education and enable them to

embark on innovations that could not take place in regular school settings. While the regulatory scheme for charter schools was quite limited in 1991[10], the ensuing 23 years have seen increasing oversight and regulation of charter schools to the point that, in many important respects, they are now more highly regulated by the State than traditional schools.

Charter schools must comply with numerous provisions of the state's education code including adherence statewide accountability requirements governing standards and assessments in chapter 120B. A charter school must comply with sections 125A.02, 125A.03 to125A.24, and 125A.65 and rules relating to the education of pupils with a disability as though it were a district. A charter school must provide instruction each year for at least the number of hours required by section 120A.41. A charter school is subject to the same financial audits, audit procedures, and audit requirements as a district, (except as required under Minn. Stat. §124D.10 subd. 6a). Charter schools must comply with all federal, state, and local health and safety requirements applicable to school districts. Minn. Stat. §124D.10 subd. 8. A charter school is subject to and must comply with Minnesota's Human Rights Act (chapter 363A); the Pupil Fair Dismissal Act (§§121A.40 to121A.56); the Minnesota Public School Fee Law (§§123B.34 to 123B.39); the Minnesota Government Data Practices Act and the Open Meeting Law (chapters 13 and 13D); the Pledge of Allegiance requirement under §121A.11 subd. 3; online course and program approval as required under

---

[10] The Minnesota Legislature established outcome-based/charter schools as a part of the 1991 Omnibus K-12 Education Finance Bill (House File 700/Senate File 467, Laws of Minnesota 1991, chapter 265, article 9, section 3).

§124D.095; transfer of records provisions under §120A.22 subd. 7, and §§138.163 and 138.17 governing the management of local records.   A charter school is subject to and must comply with continuing truant notification under §260A.03; must develop and implement a teacher evaluation and peer review process under §122A.40 subd. 8, paragraph (b), clauses (2) to (12); must adopt a policy, plan, budget, and process, consistent with §120B.11, to review curriculum, instruction, and student achievement and strive for the world's best workforce.

And unlike traditional public schools, the Minnesota Department of Education and the Commissioner of Education have substantial oversight authority with regard to charter school operation. For example, unlike traditional schools, charter schools require specific approval from Commissioner of Education before they can operate.  Minn. Stat. §124D.10 subd. 4(b).  Moreover, unlike traditional schools, charter schools can be forced to cease operations by the Commissioner of Education.   Minn. Stat. §124D.10 subd. 23(d).

Furthermore, unlike traditional schools, which operate under oversight by an elected school board, charter schools are generally governed by a board of directors "elected" by parents and staff, but that board is directly accountable to an "authorizer". Each charter school must enter into a contract with an authorizer and adhere to a strict set of performance standards which are articulated in a contract between the authorizer and the charter school. Minn. Stat. §124D.10 subd. 4. This relationship, in turn, is overseen by the Commissioner of Education who is required to oversee charter school authorizers and evaluate authorizers' capacity to authorize charter schools.

In fact, Minn. Stat. §124D.10 was significantly amended in 2009 to increase the Department's authority and responsibility over authorizers. *See* 2009 Minn. Laws ch. 96, art. 2, §41, at 1528–46. The legislature *added* criteria which the commissioner is required to consider when evaluating a prospective authorizer's application for approval.   The legislature also added a provision requiring prospective authorizers to submit an affidavit describing the organization's capacity to serve as an authorizer, as well as the application and review process the authorizer will use to make decisions regarding the granting of charters. Minn. Stat. §124D.10 subd. 3(c), (d) (2010). Further, the 2009 amendment specified authorizers' responsibilities and delineated the department's responsibility to review authorizers' performance. Minn. Stat. §124D.10 subd. 3(g), (h) (2010).

If a charter school wishes to obtain a different authorizer, there is a strict regulatory process that must be followed.  The 2009 amendments to the charter school law added the requirement that the commissioner "determine whether the charter school and prospective new authorizer can identify and effectively resolve those circumstances causing the previous authorizer  the charter school to mutually agree to terminate the contract" before determining whether to approve the transfer. Minn. Stat. §124D.10 subd. 23(c). The Commissioner may still disapprove of a transfer to a new authorizer.  If that happens, and the current authorizer and charter school cannot agree on a new contract, the charter school must close. *Id.*

This is a significant regulatory scheme which subjects charter schools to oversight by both authorizers and the Commissioner of Education, unlike anything applicable to traditional school districts, cities and counties. The notion that such schools are

"autonomous" is simply not the case in Minnesota any longer.

       7.     Whether it has the power to sue and be sued and to enter into contracts.

Charter schools, like traditional school districts, have the power to sue and be sued and enter into contracts. *Compare* Minn. Stat. §124D.10 subd. 25 ("[t]he board of directors of a charter school may sue and be sued") with Minn. Stat. §123B.24, 25 (judgments); and §124D.10 subd. 11 (contracts with teachers) with §123B.52 (contracts).

       8.     Whether its property is immune from state taxation.

This factor is essentially, inapplicable, because charter schools cannot use state funds to purchase real property.

       9.     Whether the sovereign has immunized itself from responsibility for the agency's operations.

There are nearly 200 agencies, boards and councils in at the state level.[11]  Out of this vast number of state entities, the State has chosen to immunize only one department from action by charter schools. *See* Minn. Stat. §124D.10 subd. 25.[12]

---

[11] http://mn.gov/portal/government/state/agencies-boards-commissions/

[12] Under Minn. Stat. §124D.10 subd. 25(c), immunity is limited to the Commissioner of Education:  (c) The commissioner… [is] immune from civil or criminal liability with respect to all activities related to a charter school they approve or authorize. Additionally, Minn. Stat. §124D.10 subd. 25(d) states, "Notwithstanding section 3.736, the charter school shall assume full liability for its activities and indemnify and hold harmless the commissioner and department officers, agents, and employees."  Clause (d) goes on to state that "[a] charter school is not required to indemnify or hold harmless a state employee if the state would not be required to indemnify and hold the employee harmless under section 3.736, subdivision 9."  This language is in stark contrast, for example, to the sweeping immunity from charter school liability the Michigan legislature has enacted. *See* footnote 13, infra. Had the Minnesota legislature intended to comprehensively exempt the state from the liability of a charter school it could have done so.

On virtually every one of these nine indicators—and clearly on the most salient indicators—charter schools are far more akin to instrumentalities of the state than they are autonomous, local units of government.

Very few federal cases on the topic of charter school immunity exist, and most of those decisions are unreported.  In  *Doe v. Willits Unified Sch. Dist.*, 2010 U.S. Dist. LEXIS 33152, March 8, 2010,  summary judgment granted by *Doe v. Willits Unified Sch. Dist.*, 2010 U.S. Dist. LEXIS 52198 (N.D. Cal., May 27, 2010), a federal district court in California law concluded that charter schools are arms of the state entitled to Eleventh Amendment immunity.  Considering statutory language quite similar to the language in Minnesota's law, the court reasoned as follows:

> California law is well settled that providing public education is a state function….  Charter schools *are* public schools because … [they] are part of the public school system … [and] are under the 'exclusive control of the officers of the public schools….'' (citing Cal. Educ. Code § 47615(a)). Although [charter schools] have operational independence, an overarching purpose of the charter school approach is to infuse the public school system with competition in order to stimulate improvement in *all* its schools…. (citing Cal. Educ. Code § 47601(g)).
>
> As a charter school, WCS performs a central government function. California law acknowledges that charter schools are part of the public school system and that their operational independence helps charter schools to provide public education, a government function….Therefore, WCS performs a central government function and satisfies the second factor of the *Mitchell* analysis.

In *Lindsey v. Matayoshi,* 950 F.Supp.2d 1159 (D. Hawaii, 2013), the federal court also determined that charter schools are arms of the state under Hawaii law.  The court noted the following facts in its analysis:

> As a charter school, Kanu has been given "the flexibility and independent authority to implement alternative frameworks with regard to curriculum, facilities management, instructional approach, virtual education, length of the school day, week, or year, and personnel management." HRS § 302 B–1. Although governed by an autonomous local school board, HRS § 302B–7(c), the Hawaii Department of Education ("DOE") maintains responsibility for providing a free education to all students, including those in a charter school. HRS § 302B–15….

As is true in Minnesota, Charter schools in Hawaii "…are funded through the DOE in accordance with the funding scheme applied to all other public schools—they receive a baseline per-pupil allocation, subject to legislative appropriation and reductions imposed by the governor," HRS § 302B–12(a), and are "eligible for all federal financial support to the same extent as all other public schools." HRS §302B–12(b). Charter schools in Hawaii, unlike those in Minnesota, "… are authorized to generate additional funds and may disperse those funds without state oversight, HRS § 302B–12(b)…., HRS §302B–12(e)".  And, while public schools in Hawaii lack authority to purchase real property,  unlike those in Minnesota  "…the DOE may acquire facilities for public schools, including land, with the concurrence of the director of finance." HRS §302A–1506. In Hawaii, if a charter school dissolves or a charter is revoked, "the State shall have first right, at no cost to the State, to all the assets and facilities of the charter school[.]" HRS §302B–14(I).  Finally, in Hawaii payment of judgments against public schools is not automatic; it is subject to legislative approval and appropriation. *See* Haw. Const. art.

7, §5.

Given that Minnesota's charter school law requires far more oversight by the State and authorizers than that in Hawaii, and given that a school's inability to satisfy a pre-empts the return of money to Minnesota's state treasury, Minnesota's charter schools are even more closely intertwined with the state's system of public education that those in deemed immune from suit under the law in Hawaii.

The one case that could be located holding that charter schools are not entitled to immunity arose under Michigan law. *See Mosaica Advantage, Inc. v. Detroit Advantage Academy,* 2005 WL 2417027 (E.D. Mich). However, Michigan law is different from Minnesota law, in that the state has specifically immunized itself against any and all liability from the operations of a charter school[13] and once the state funds are provided to the charter school, "a subsequent judgment seeking payment from Defendant that exceeds Defendant's assets could not then be satisfied by diverting funds from the state treasury". The court also noted, that charter schools enjoy "… a significant amount of autonomy" in "self-management".   The court found unpersuasive the fact that the charter schools' function constitution "the performance of essential public purposes and governmental functions of this state," M.C.L. § 380.501(1) and that, unlike Michigan municipalities,

---

[13] M.C.L. § 380.503b states as follows: "(1) An agreement, mortgage, loan, or other instrument of indebtedness entered into by a public school academy and a third party does not constitute an obligation, either general, special, or moral, of this state or an authorizing body. The full faith and credit or the taxing power of this state or any agency of this state, or the full faith and credit of an authorizing body, may not be pledged for the payment of any public school academy bond, note, agreement, mortgage, loan, or other instrument of indebtedness.  (2) This part does not impose any liability on this state or on an authorizing body for any debt incurred by a public school academy."

26

"public school authorities are statutorily prohibited from levying taxes." Given these cases, the *Sherman* factors and given that the Minnesota legislature has clearly signaled its intent to broadly immunize itself and all political subdivisions from claims brought under Minnesota's False Claims Act, it cannot be said that the State of Minnesota has clearly and unequivocally indicated an intent to waive immunity with respect to the very same claims brought against its charter schools in federal court. Defendants respectfully urge this court to hold that Minnesota's charter schools are not subject to suit in Federal Court under the Eleventh Amendment.

## IV.    MINNESOTA CHARTER SCHOOLS ARE IMMUNE FROM LIABILITY UNDER THE FEDERAL FALSE CLAIMS ACT BECAUSE THEY ARE NOT "PERSONS"

Jurisdiction over Plaintiffs' FCA suit is determined initially by a consideration of whether charter schools are "persons" under the language of the act.  In *Vermont Agency of Natural Res. v. United States ex. Pl. Stevens,* 529 U.S. 765, 787-88 (2000), the Supreme Court reasoned that analysis is of the word "person" was based on canons of statutory construction relating to protection of the state's sovereign immunity,  including the following presumptions:

> 1) that the term person does not include the sovereign, *id.* at 780; 2) the rule that Congress must clearly state its intention to subject states to liability, *id.*, at 781-82, 787; 3) the presumption against imposition of punitive damages on governmental entities, *id.* at 784-85, and 4) the ordinary rule of statutory construction that if Congress in tends to alter the usual constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute, *id.* at 787.  …To effectuate Congress's presumed intent, *we must interpret the term 'person' under § 3729 in a way that avoids suits against state instrumentalities that are*

> *effectively arms of the state immune from suit under the Eleventh Amendment.*

*Stoner v. Santa Clara County Office of Education,* 502 F.2d 116, 1121 (9th Cir. 2007), construing *Stevens*, supra.

There is no clear weight of authority on the issue of whether charter schools are "persons" for purposes of the Federal False Claims Act and individual states' false claims acts. As is true with the Eleventh Amendment analysis, this is a determination that is contextually dependent, based on how charter schools are funded and based on the extent of state oversight of charter operations. But all of the compelling reasons for holding that Minnesota charter schools are immune from liability under the Eleventh Amendment apply equally to this Court's jurisdiction over claims brought under the Federal False Claims Act. Minnesota has not clearly and unequivocally waived its right to claim immunity for the charter schools it regulates and funds, and which are part of the state's system of public education, an d any doubt should be resolved in a way that avoids liability under this treble damages statute.

## CONCLUSION

For all the reasons stated above, Defendants MTCS and MVHS respectfully request that this Court dismiss Plaintiffs' claims against them in their entirety.

DATED: February 3, 2014                    _____s/Cindy Lavorato_____
                                           Cindy Lavorato (#0061244)
                                           Booth & Lavorato LLC
                                           10520 Wayzata Boulevard
                                           Minnetonka, Minnesota 55305
                                           (763) 253-4155

                                           *Attorneys for Defendants Minnesota
                                           Transitions Charter School and
                                           Minnesota Virtual High School*