# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF MINNESOTA, ex rel.  JILL BACHMANN and SHELLEY MADORE, | Civil No. 12-1359 (JRT/JSM) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER ON MOTION TO DISMISS** |
| MINNESOTA TRANSITIONS CHARTER SCHOOLS and MN VIRTUAL HIGH SCHOOL, | |
| Defendants. | |

---

Ann M. Bildtsen and Pamela Marentette, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN  55415, for plaintiff United States of America.

Kathryn M. Woodruff, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 900, St. Paul, MN  55101, for plaintiff State of Minnesota.

Bryce M. Miller, **SCHAEFER HALLEEN LLC**, 412 South Fourth Street, Suite 1050, Minneapolis, MN  55415, for plaintiffs Bachmann and Madore.

Cindy L. Lavorato, **BOOTH & LAVORATO LLC**, 10520 Wayzata Boulevard, Suite 200, Minnetonka, MN  55305, for defendants.

Plaintiffs Shelley Madore and Jill Bachmann bring this action under the False Claims Act ("FCA") and the Minnesota False Claims Act ("MFCA") on behalf of the United States and the State of Minnesota alleging that Defendants Minnesota Transitions Charter Schools and Minnesota Virtual High School submitted fraudulent attendance and

enrollment information and special education instruction reports to the State of Minnesota and to the United States Department of Education in order to receive funds to which they otherwise would not have been entitled. Defendants move to dismiss, arguing that they are entitled to immunity under the Eleventh Amendment, that they are not proper defendants under either Act, and that Plaintiffs' allegations fail to state a claim upon which relief could be granted. The Court concludes that Defendants are not entitled to Eleventh Amendment immunity and that they are proper defendants under the FCA, but not under the MFCA. The Court will thus grant Defendants' motion to dismiss with respect to Plaintiffs' claims under the MFCA. Because Plaintiffs' allegations under the FCA are inadequate in several respects, the Court will dismiss Plaintiffs' claims under that statute without prejudice.

## BACKGROUND

### I.      PARTIES

Defendant Minnesota Transitions Charter Schools ("Transitions") operates ten charter schools in Minnesota, including Defendant Minnesota Virtual High School ("MVHS"), which is an online high school offering full-time education to students in grades six through twelve. (Compl. ¶¶ 10, 12, June 6, 2012, Docket No. 1.)

Relator Shelley Madore worked for MVHS as an administrative coordinator for the special education program from January 19, 2009 to June 14, 2010. (*Id*. ¶ 9.) In this position, Madore had access to student enrollment and attendance data, also known as Average Daily Membership ("ADM"), and reports about this data that Defendants generated to secure state and federal funding. (*Id.*) This included data submitted via the

Minnesota Automated Reporting Student System ("MARSS").  (*Id.*)  During her employment, Madore served as an "administrative liaison" between MVHS and its principal, Jim Roth, and Transitions and its superintendent, Tony Scallon.  (*Id.* ¶ 9.)

Relator Jill Bachmann worked for Defendants as a special education teacher from August 23, 2007 to June 14, 2010.  (*Id.* ¶ 8.)  Bachmann provided services to special education students online and created Individual Education Plans ("IEPs").  (*Id.* ¶¶ 41, 46.)  IEPs are written annually and establish a plan for student achievement that consists of measurable goals and objectives, accommodations and modifications, and instruction and services provided through direct and indirect teacher contact.  (*Id.* ¶ 42.) Plaintiffs allege that a majority of the students enrolled at MVHS are special education students, and that each special education teacher, including Bachmann, managed an average of 37 to 39 student cases.  (*Id.* ¶¶ 20, 50.)  As required by the Individuals with Disabilities Education Act ("IDEA"), a committee of general and special education teachers, school and district representatives, parents, and the student, as appropriate, meets annually to draft a student's IEP.  (*Id.* ¶¶ 42, 55.)

## II.   ALLEGATIONS

Plaintiffs allege that Defendants submitted knowingly false documents and records in order to receive and seek funding to which they were not entitled from both the United States and the State of Minnesota.  (*See id.* ¶ 1, 3.)  Plaintiffs base this claim on two theories: first, that Defendants manipulated attendance and enrollment reports submitted to the state so as to receive funding for students without being held accountable for those students' performance on standardized tests; and second, that Defendants overstated the

services provided to special education students in order to receive more federal special education funds.  (*See id.* ¶ 3.)

A.      **Attendance and Enrollment**

According to Plaintiffs, charter school funding comes from two main sources: state general fund revenues given to the school district, and reimbursement for special education services.  (*Id.* ¶ 1.)  In order to receive general education funding, charter schools must submit certain certifications and reports, some of which include exam participation reports, ADM, and MARSS data.  (*Id.* ¶¶ 9, 16.)  Plaintiffs explain this system as follows:

> August and September MARSS files are used to compute the ADM used for the September 30 and October 30 entitlements, respectively.  For FY 2012, charter schools' final aid entitlements using MARSS data is computed for October 30 only and it uses the September MARSS data. These actual ADM and the aid to which the district or school is entitled are compared to the aid paid to the district or charter school during the school year based on the district's or charter school's ADM estimates provided earlier in the year.

(*Id.* ¶ 16.)  Plaintiffs allege that, based on these reports, Defendants received both general and special education state funds in bi-weekly installments.  (*Id.* ¶ 17.)

Plaintiffs allege that, from the beginning of her employment, Madore noticed a pattern of aggressive student enrollment in the MVHS program followed by lax record keeping of attendance.  (*Id.* ¶ 29.)  Plaintiffs assert that MVHS Principal Jim Roth and Transitions Superintendent Scallon explained to Madore that final funding was based on September ADM data.  (*Id.* ¶¶ 9-10, 29.)  Further, Plaintiffs allege that Defendants engaged in various enrollment campaigns, such as offering free laptops to each enrolling

student, and loosened enrollment requirements by allowing them to submit their own academic transcripts from prior schools instead of contacting each student's former school for an official copy. (*Id.* ¶¶ 29-31.)

Plaintiffs allege that in the beginning of 2010, Madore began to express concerns to Defendants about discrepancies she found between ADM data and actual attendance records. (*Id.* ¶ 32.) Plaintiffs claim that Madore informed Defendants about the discrepancies, as well as concerns she had about the lack of a truancy policy for the school. (*Id.*) Plaintiffs further assert that Madore expressed concerns about truancy and inaccurate attendance tracking to School Psychologist and Assistant Director Kim Mehlos, but Mehlos dismissed Madore's concern. (*Id.* ¶ 35.) After reporting her concerns, Madore was relieved of her MARSS reporting duties. (*Id.* ¶ 32.)

According to the allegations in the Complaint, Defendants began to pay attention to truant students in the spring of 2010 due to concerns about the negative impact non-attending students would have on the school's performance on state standardized tests. (*Id.* ¶¶ 33-34.) Plaintiffs claim that Scallon ordered that students be dropped from enrollment for non-attendance shortly before state testing to prevent them from negatively impacting test results. (*Id.* ¶ 34.) After testing, however, in order to meet the ADM reported in March, Plaintiffs assert that Scallon then instructed Defendants to re-enroll the truant students. (*Id.*)

Plaintiffs also contend that Defendants signed paperwork giving a student access to social security benefits for being a full-time student when, in fact, the student did not

attend full-time. (*Id.* ¶ 27.) Specifically, Plaintiffs claim that Madore told Roth that signing the paperwork was contrary to the law, but that Roth signed it anyway. (*Id.*)

Plaintiffs allege that Madore received a notice of nonrenewal of her annual contract on June 4, 2010, and notice of termination on June 14, 2010, which "accused her of violating student data privacy laws." (*Id.* ¶ 38.)

**B.    Special Education Records**

Plaintiffs allege that "[f]ederal funding for special education is based on the number of special education students enrolled in the school, the school's total enrollment, and the school's free and reduced lunch count." (*Id.*) With regard to special education, Plaintiffs allege that Defendants submitted fraudulent information in IEPs. (*Id.* ¶¶ 49-50, 54-56.) Specifically, Plaintiffs claim that in the fall of 2009, Scallon instructed Bachmann and all special education teachers to list one hour each of direct and indirect student contact per week in each student's IEP, regardless if that time was actually spent with the student. (*Id.* ¶ 49.) Plaintiffs allege that Bachmann objected because the average case load per teacher made that level of contact impossible, and because most students did not need that amount of contact. (*Id.* ¶ 50.) Bachmann informed Defendants that she would not list contact time on the IEPs which she had not actually done. (*Id.* ¶ 52.) Plaintiffs also allege that, at one point, Bachmann observed that student IEP meetings lacked all of the required participants under the IDEA, and that she complained to school leadership about this. (*Id.* ¶ 54.) According to Plaintiffs, Defendants' response was inadequate, because under the IDEA a general education teacher of the student must attend each IEP meeting, but Defendants' solution was to have an administrator with a

physical education license who did not have direct contact with the students attend.  (*Id.* ¶¶ 55-56.)  Bachmann objected to this.  (*Id.* ¶ 56.)  On June 4, 2010, Bachmann received notice that her contract would not be renewed in August 2010, and on June 14, 2010, she received a termination notice.  (*Id.* ¶¶ 57-58.)

## III.   THIS ACTION

Plaintiffs brought this qui tam suit seeking damages for Defendants' alleged fraudulent filing of student records in order to receive state and federal funding for general and special education programming.  (*Id.* ¶ 3.)  In their complaint, Plaintiffs allege three causes of action:  (1) violation of the FCA, 31 U.S.C. § 3729(a); (2) violation of the Reverse FCA, 31 U.S.C. § 3729(a); and (3) violation of the MFCA, Minn. Stat. § 15C.01.  (*Id.* ¶¶ 59-73.)  The United States and the State of Minnesota declined to intervene.  (Notice of Election to Decline Intervention, June 10, 2013, Docket No. 14.)  Defendants now move to dismiss Plaintiffs' claims.[1]  Defendants raise several arguments in support of dismissing this action: first, that Defendants are entitled to sovereign immunity under the Eleventh Amendment because they are arms of the state, second that Defendants, as arms of the state, are not "persons" under the FCA or the MFCA, third, that the MFCA claim pre-dates the effective date of the amended MFCA, and fourth that Plaintiffs' allegations fail to state a claim upon which relief could be granted.

---

[1] The Complaint initially included allegations against two other Defendants, Advanced Academics, Inc. and Devry, Inc., but the parties stipulated to the dismissal of those Defendants without prejudice after they moved to dismiss.  (*See* Mot. to Dismiss by Advanced Academics, Inc., Devry, Inc., Dec. 16, 2013, Docket No. 26; Order for Dismissal Without Prejudice, Apr. 16, 2014, Docket No. 49.)

# ANALYSIS

## I.     STANDARD OF REVIEW

Although Defendants do not clearly specify as much, the Court construes Defendants' motion as one under both Federal Rule of Civil Procedure 12(b)(1) for lack of subjective matter jurisdiction – because Eleventh Amendment immunity would deprive the Court of jurisdiction, *see Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 64 (1996) – and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject matter jurisdiction and requires the Court to examine whether it has authority to decide the claims.  *Uland v. City of Winsted,* 570 F. Supp. 2d 1114, 1117 (D. Minn. 2008).  There are two types of subject-matter-jurisdiction challenges under Rule 12(b)(1): "facial" attacks and "factual" attacks.  *See, e.g., Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).  A facial attack challenges subject-matter jurisdiction based solely on the allegations appearing on the face of the complaint.  *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  "In ruling on such a motion, a court must afford the non-moving party the same protections it would be entitled to under Rule 12(b)(6)."  *Gilmore v. Nw. Airlines, Inc.*, 504 F. Supp. 2d 649, 653 (D. Minn. 2007).  "By contrast, a factual attack depends upon the resolution of facts in order to determine whether subject-matter jurisdiction exists; a court may rely upon matters outside the pleadings when considering such an attack, and the non-moving party does not receive the benefit of Rule 12(b)(6)'s safeguards."  *Id.*  Here, Defendants do not challenge the adequacy of the facts underlying jurisdiction, but rather whether, as a matter of law, Defendant charter schools are entitled

to Eleventh Amendment sovereign immunity.   Thus, the Court treats this as a facial challenge to its subject matter jurisdiction and considers Plaintiffs' complaint under the rules governing pleading standards for FCA claims.   *Cf. Jones v. United States*, 727 F.3d 844, 846 (8th Cir. 2013).

## II.   FALSE CLAIMS ACT

The False Claims Amendments Act of 1986 included a qui tam provision to encourage whistleblowers.  31 U.S.C. § 3730.  In a qui tam action, a plaintiff may bring a private civil action on behalf of himself and on behalf of the United States government against a defendant who, in violation of 31 U.S.C. § 3729, has submitted false claims to the United States for payment.  The government may choose to intervene in the action, 31 U.S.C. § 3730(b)(4)(A), or it may decline to join the action, leaving the qui tam plaintiff as the plaintiff.  31 U.S.C. § 3730(b)(4)(B).

The FCA imposes liability if a defendant (1) "knowingly presents, or causes to be presented, [to a federal official] a false or fraudulent claim for payment or approval," or (2) "knowingly makes . . . a false record or statement to get a false or fraudulent claim paid or approved."  31 U.S.C. § 3729(a)(1)-(2).[2]  The FCA is "[g]rounded in fraud, so claims under it "must satisfy Rule 9(b)'s heightened pleading requirement" that parties "must state with particularity the circumstances constituting fraud or mistake."  *United*

---

[2] The elements of a claim under the MFCA are similar.  Under that statute, "[a] person . . . is liable to the state or the political subdivision" if the person, among other things, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" or "knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  Minn. Stat. § 15C.02(a).

*States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009); *see also* Fed. R. Civ. P. 9(b). "[A] complaint alleging fraud must identify who, what, where, when, and how." *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir.2003).

## III.   ELEVENTH AMENDMENT AND "PERSON" UNDER THE FCA

Defendants argue that Plaintiffs' claims must be dismissed because charter schools are immune from damages liability through the Eleventh Amendment. Alternatively, they argue that they are not "person[s]" under the FAC or the MMFCA, *see* 31 U.S.C. § 3729(a)(1); Minn. Stat. § 15C.02, and therefore are not subject to liability under either Act.

### A.     Eleventh Amendment

The doctrine of sovereign immunity, embodied in the Eleventh Amendment, protects states and state officials from liability in actions seeking monetary damages when those damages would be paid from the state treasury. U.S. Const. amend. XI; *Hans v. Louisiana*, 134 U.S. 1, 15 (1890) (states immune from suits by own citizens). It provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

In *United States ex rel. Rodgers v. State of Ark.*, 154 F.3d 865 (8th Cir. 1998), the Eighth Circuit held that the Eleventh Amendment does not bar qui tam actions against

states because such actions are, in essence, brought by the United States, which is not included in the list of parties in the Eleventh Amendment from which states are immune. *Id.* at 868 (holding "a qui tam action under this Act is a suit by the United States for Eleventh Amendment immunity purposes" where United States had declined to intervene); *see also United States v. Mississippi*, 380 U.S. 128, 140 (1965) ("The Eleventh Amendment in terms forbids suits against States only when 'commenced or prosecuted . . . by Citizens of another State, or by Citizens or Subjects of any Foreign State.' . . . [N]othing in this or any other provision of the Constitution prevents or has ever been seriously supposed to prevent a State's being sued by the United States."). In reaching its conclusion, the Eighth Circuit reasoned:

> The focus of the Act is on exposing fraud on the government and recovering resulting government losses. The qui tam provisions facilitate this process, but they do not alter the underlying character of the action as one for the aggrieved party as defined by the statute. The qui tam mechanism exists to motivate individuals to further the interest of the government in remaining free from frauds perpetrated against it. Confronting the same question before us, the Fourth Circuit stated, and we agree, that "the structure of the qui tam procedure, the extensive benefit flowing to the government from any recovery, and the extensive power the government has to control the litigation weigh heavily against [the defendant]."

*Id.* at 868.[3]

---

[3] The Eighth Circuit also referenced how several other circuits had reached the same conclusion. *See United States ex rel. Rodgers v. State of Ark.*, 154 F.3d 865, 868 (8th Cir. 1998) (citing *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1217 n. 8 (9th Cir.1996); *United States ex rel. Hall v. Tribal Dev. Corp.* 49 F.3d 1208, 1213 (7th Cir.1995); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1154 (2d Cir.), *cert. denied*, 508 U.S. 973 (1993)).

However, after *Rodgers*, the Supreme Court issued its ruling in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000). There, the Supreme Court concluded that, although Eleventh Amendment immunity is a jurisdictional question that typically must be addressed first, the question of whether states are proper defendants as "persons" under the False Claims Act is fairly considered before considering the applicability of the Eleventh Amendment. *Id.* at 778-80. The Court proceeded to address whether the FCA permitted an action under it to be brought against the states, concluding that it did not because states are not a "person" under 31 U.S.C. § 3729(a). *Id.*

The Supreme Court did not squarely address the issue of whether the Eleventh Amendment would apply on the basis of the identity of the **plaintiff** – in other words, whether an FCA case could be deemed as brought by the United States and therefore not subject to the Eleventh Amendment. Instead, it looked to the identity of the **defendant** – the state – and whether Congress intended, by encompassing states in the definition of the word "person" used in 31 U.S.C. § 3729(a), to abrogate Eleventh Amendment state sovereign immunity for FCA claims. *See Stevens*, 529 U.S. at 773 & n.4 (observing that the Court was "leav[ing] open today" the Eleventh Amendment issue); *id.* at 787 ("We of course express no view on the question whether an action in federal court by a qui tam relator against a State would run afoul of the Eleventh Amendment, but we note that there is 'a serious doubt' on that score."). Applying the "longstanding interpretive presumption that 'person' does not include the sovereign," and finding no indication of statutory intent

to the contrary, the Court concluded that the term "person" does not include states "for purposes of *qui tam* liability." *Id.* at 780-87.

These precedents instruct that, for the charter schools at issue here, the Eleventh Amendment does not deprive the Court of jurisdiction because *Rodgers* instructs that the suit is fairly considered to have been brought by the United States, and *Stevens* does not appear to have disturbed that rule.[4]   But the action may nevertheless be barred if the charter school Defendants are not "person[s]" under the text of the FCA, as the Court in *Stevens* concluded states were not.  The Court turns to that issue next.

### B.   "Person" Under the FCA

The relevant provision of the FCA subjects to liability "[a]ny person" who, among other things, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a).  The FCA does not include a definition for the term "person."  *See* 31 U.S.C. § 3729(b); *see also Stevens*, 529 U.S. at 786.

After *Stevens* established that "person" does not include states, lower courts had opportunity to address whether it includes local governments and municipal entities.  *See*

---

[4] It does not appear that the Eighth Circuit has treated *Stevens* as abrogating its conclusion from *Rodgers* that qui tam actions are brought by the United States and thus may be brought against states.  It appears that the only suggestion otherwise is from a dissent.  *See United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa*, 269 F.3d 932, 938 (8th Cir. 2001) (Gibson, C.J., dissenting) ("The district court also based its decision on the belief that this court, in light of *Stevens*, would overrule *United States ex rel. Rodgers v. Arkansas* . . . I agree that *Rodgers* has lost most of its validity in light of Stevens, and I also agree with the court today, that *Stevens* has overruled *United States ex rel. Zissler v. Regents of the University of Minnesota*, 154 F.3d 870 (8th Cir.1998), to the extent that decision held that states are persons under the False Claims Act." (citations omitted)).

*Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 931 (8th Cir. 2002) ("*Stevens* has given rise to much litigation and divided authority in the lower courts over its application to local governments and municipal entities like [the St. Louis Housing Authority].").  The Eighth Circuit observed that while some of the courts of appeals "extended *Stevens* 'immunity' to local governments in the qui tam context," others "have held that *Stevens* does not apply to local governments."  *Id.* (collecting example cases of both the former and the latter).  But the Supreme Court resolved the split shortly thereafter and held that municipal governments **are** "persons" under the FCA and thus not immune from suit under the Act.  *See Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 124 (2003) (holding that Cook County Hospital, which was run by Cook County, was a "person" under the FCA, as, "[t]he term 'person' in § 3729 included local governments").

Thus, the Court must determine whether Defendants here – Minnesota charter schools – are "persons" under the FCA, given that states are not persons but municipal governments are.  For this analysis, the Court turns back to the Eleventh Amendment, as courts have suggested, and the parties do not dispute,[5] that courts analyzing whether an entity is a "person" under the FCA should look to the analysis for determining whether an entity is entitled to state sovereign immunity under the Eleventh Amendment.  *See United States ex rel. Oberg v. Kentucky Higher Educ. Student Loan Corp.*, 681 F.3d 575, 579-80 (4th Cir. 2012) ("although the question of whether an entity is a proper FCA defendant is one of statutory rather than constitutional interpretation, there is a 'virtual coincidence of

---

[5] Counsel for Defendants confirmed this at oral argument upon a direct inquiry from the Court.

scope'" between the statutory inquiry under the FCA and the Eleventh Amendment
sovereign immunity inquiry," relying on *Stoner v. Santa Clara Cnty. Office of Educ.*, 502
F.3d 1116 (9th Cir. 2007)); *In re Deposit Ins. Agency*, 482 F.3d 612, 622 (2d Cir. 2007)
("The Court [in *Stevens*] viewed the two questions as basically identical, since '[t]he
ultimate issue in the statutory inquiry is whether States can be sued under [the] statute,'
while 'the ultimate issue in the Eleventh Amendment inquiry is whether unconsenting
States can be sued under [the] statute.'" (quoting *Stevens*, 529 U.S. at 779-80)).

The Supreme Court held in *Mt. Healthy City School District Board of Education v.
Doyle*, 429 U.S. 274 (1977), that "the eleventh amendment bars private parties from
suing a state in federal court," but that "state-connected entities or subdivisions do not
always share in their state's immunity."  *Id.* at 280 (eleventh amendment bar to suit in
federal courts extends to states and state officials in appropriate circumstances, but not to
counties and similar municipal corporations).  Rather, "[u]nless a political subdivision of
the state is simply the 'arm or alter ego of the state,' it may sue and be sued pursuant to
the same rules as any other corporation." *Gilliam v. City of Omaha*, 524 F.2d 1013, 1015
(8th Cir. 1975) (citation omitted).  In determining the applicability of the Eleventh
Amendment to the political subdivisions of the state, courts must "examine the particular
entity in question and its powers and characteristics as created by state law to determine
whether the suit is in reality a suit against the state." *Id.* at 1015; *see also Sherman v.
Curators of Univ. of Missouri*, 16 F.3d 860, 862-63 (8th Cir. 1994).

The Eighth Circuit has focused on two inquiries when considering whether entities
are entitled to Eleventh Amendment immunity:  the extent to which actions against those

entities could result in expenditures from the state's funds and the "degree of local autonomy and control." *See Greenwood v. Ross*, 778 F.2d 448, 453 (8th Cir. 1985) ("Courts typically look at the degree of local autonomy and control and most importantly whether the funds to pay any award will be derived from the state treasury.");[6] *see also Sherman v. Curators of Univ. of Missouri*, 16 F.3d 860, 864-65 (8th Cir. 1994) ("The University cannot create its own eleventh amendment immunity by structuring its resources so as to pay all breach of contract damages out of state funds. Thus, the question on remand is not whether the University chooses to pay contract damages out of state funds, but whether a judgment against the University can be paid from non-state funds under the University's discretionary control."). Furthermore, although "State universities and colleges almost always enjoy Eleventh Amendment immunity . . . community and technical colleges often have deep roots in a local community" and when

---

[6] The Eighth Circuit gave an example of how these two inquiries function together in *Hadley v. North Arkansas Community and  Technical College*, 76 F.3d 1437, 1442 (8th Cir. 1996):

> [T]he provisions delimiting the responsibility of the State and Local Boards reveal a community college system that blends state and local interests and authorities. The local control is of course relevant but falls short, in our view, of making NACTC the Eleventh Amendment equivalent of a political subdivision. In the final analysis, while Eleventh Amendment immunity is a question of federal law, the structuring of state government is the province of the States.  Nothing precludes a State from delivering regional or even local governmental services through an arm of the State, from permitting voters in an affected locale to help staff a state agency, or from providing highly structured local input to state agency decisionmaking.  Here, Arkansas calls NACTC a state agency, allows for substantial local autonomy but provides ultimate state control, and – most importantly – funds the agency's general operations primarily from the state treasury.

*Id.* at 1442.

"those roots include local political and financial involvement, the resulting Eleventh Amendment immunity questions tend to be **difficult and very fact specific**." *Hadley v. N. Arkansas Cmty. Technical Coll.*, 76 F.3d 1437, 1438-39 (8th Cir. 1996) (emphasis added).

Specifically with regard to local municipalities such as school districts, the Eighth Circuit has held that "[c]ontrolling case law holds that a county, as well as the school board of such a political subdivision, does not occupy the same position as a state for eleventh amendment purposes." *Miener v. State of Mo.*, 673 F.2d 969, 980 (8th Cir. 1982) (citing *Edelman v. Jordan*, 415 U.S. 651, 667 n.12 (1974) (addressing counties)); *see also Hadley*, 76 F.3d at 1442 n.9 ("most local school districts do not enjoy Eleventh Amendment immunity because they are dependent on local taxes and controlled by local governmental entities, like cities and counties").

Defendants argue that under this Eleventh Amendment immunity analysis, charter schools in Minnesota qualify as an "arm or alter ego of the state." *Gilliam*, 524 F.2d at 1015. They advise the Court to look to nine factors laid out by the Third Circuit in *Kovats v. Rutgers, The State University*, 822 F.2d 1303 (3d Cir. 1987):

> (1) local law and decisions defining the status and nature of the agency involved in its relation to the sovereign; (2) most importantly, whether the payment of the judgment will have to be made out of the state treasury; (3) whether the agency has the funds or the power to satisfy the judgment; (4) whether the agency is performing a governmental or proprietary function; (5) whether it has been separately incorporated; (6) the degree of autonomy over its operations; (7) whether it has the power to sue and be sued and to enter into contracts; (8) whether its property is immune from state taxation; and (9) whether the sovereign has immunized itself from responsibility for the agency's operations.

*Sherman v. Curators of Univ. of Missouri*, 16 F.3d 860, 865 n.6 (8th Cir. 1994) (reciting factors from *Kovats* and advising district court that, on remand, it "may also consider those factors delineated here which are not expressly or impliedly contained in *Greenwood* [778 F.2d 448 (8th Cir. 1985)] to the extent they are relevant").

In light of these factors, Defendants make several arguments as to why the Court should conclude that charter schools in Minnesota are arms of the state. First, they argue that legislation clearly indicates that charter schools are instrumentalities of the state and not autonomous local units because Minnesota Statutes refer to charter schools as "part of the state's system of public education," *see* Minn. Stat. § 124D.10, subd. 7. Second, they argue that the payment of any judgment in this case will come from the state because "virtually all of the revenue charter schools receive comes from the treasury" via general education aid, transportation aid, special education aid, building lease aid, and other general aid grants and revenue, and because they cannot levy taxes to satisfy judgments against them. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss at 15-23, Feb. 3, 2014, Docket No. 36; *see also* Minn. Stat. §§ 124D.11, subds. 2-4, 6.) They also argue that charter schools perform a governmental or proprietary function and are fundamentally part of the state's system of public schools in that they require approval from the Commissioner of Education before operating and because they must comply with the stringent requirements of conflict of interest provisions. *See* Minn. Stat. § 124D.10, subd. 4. Along the same lines, they argue that charter schools are highly regulated by the state and are directly accountable to an "authorizer" which is overseen by the State Commissioner of Education. (Defs.' Mem. in Supp. of Mot. to Dismiss at 20-22.)

Finally, they argue that Minnesota has rarely – in only one instance – chosen to immunize itself from responsibility from action by charter schools.  (*See id.* at 23 (citing Minn. Stat. § 124D.10, subd. 25).)

Plaintiffs do not engage with this analysis, but instead point to a previous case in this district involving a charter school, in which the court held that the charter school was not entitled to Eleventh Amendment immunity because it was not an arm of the state:

> Minnesota statutes explicitly define school districts as municipalities for the purposes of tort liability. Minn. Stat. § 466.01, subd. 1 ("For the purposes of [the tort liability statute], 'municipality' means any . . . school district, however organized.")[)] Moreover, Minnesota statutes also explicitly define charter schools as school districts.  Minn. Stat. § 124D.10, subd. 8(k). Thus, it is evident that under Minnesota state law, TiZA is considered a municipality.  As a municipality, it is not entitled to Eleventh Amendment immunity.

*Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad.* ("*TiZA*"), Civ. No. 09-138, 2010 WL 1840301 (D. Minn. May 7, 2010) *aff'd sub nom. Am. Civil Liberties Union of Minnesota v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088 (8th Cir. 2011).

The court there directly addressed the two issues the Eighth Circuit instructs courts to consider on this question – whether the state will have to satisfy a judgment and the degree of control:

> First, in this action, Plaintiff does not seek prospective monetary relief; instead, it seeks equitable reimbursement to the State of funds provided to TiZA.  If successful, Plaintiff seeks to have TiZA pay money back to the state treasury.  Second, while the MCSL does place certain restrictions on charter schools, these restrictions are not so extensive so as to render TiZA an arm of the State.  Indeed, charter schools have more freedom from state control than a typical school district.  *See* Minn. Stat. §§ 124D.10, subd. 1(a)(3)-(5) and subd. 10.  This freedom and increased autonomy undermines TiZA's argument that Eleventh Amendment immunity applies.

*Id.* at *5.  Like the court in *TiZA*, the Court will analyze whether Defendants—Minnesota charter schools – would be entitled to Eleventh Amendment immunity (and therefore would not be "persons" under the FCA) according to the two factors the Eighth Circuit has deemed most relevant: the degree of control the state exercises of them and whether any judgment against them would be paid with state funds.[7]

With regard to the degree of control, Defendants observe ways in which charter schools are subject to the **same** requirements as traditional school districts, but then point to ways in which they argue that charter schools are subject to state supervision beyond that which is required for traditional school districts.  (*See* Defs.' Mem. in Supp. of Mot. to Dismiss at 19-22.)  Although there may be some significant manners in which the state exerts control over charter schools that it does not over school districts, the statute sets as the default that charter schools are "**exempt** from all statutes and rules applicable to a school, school board, or school district unless a statute or rule is made specifically applicable to a charter school."  Minn. Stat. § 124D.10, subd.7 (emphasis added); *see also Minnesota Transitions Charter Sch. v. Comm'r of Minnesota Dep't of Educ.*, 844 N.W.2d

---

[7] The Court observes at the outset that this inquiry is unique to Minnesota charter schools, as charter schools in various states differ in structure, funding, and degree of state control.  For example, in California, school districts and charter schools are entitled to Eleventh Amendment immunity.  *See Wells v. One2One Learning Found.,* 141 P.3d 225, 238 (2006); *Doe ex rel. Kristen D. v. Willits Unified Sch. Dist.*, No. 09–03655 JSW, 2010 WL 890158 at *4 (N.D.Cal. Mar. 8, 2010); *J.C. by & through W.P v. Cambrian Sch. Dist.*, Civ. No. 12-03513, 2014 WL 229892 (N.D. Cal. Jan. 21, 2014).  Similarly, Hawaii charter schools are also entitled to Eleventh Amendment immunity.  *See Lindsey v. Matayoshi*, 950 F. Supp. 2d 1159, 1165 (D. Haw. 2013).  Charter schools in Michigan, however, are not.  *See Mosaica Advantage, Inc. v. Detroit Advantage Acad., Inc.*, Civ. 04-40374, 2005 WL 2417627 (E.D. Mich. Sept. 30, 2005) (where statute expressly did not impose any liability on the state, charter school was separately incorporated, capable of entering into contracts, and "enjoys a significant amount of autonomy in managing itself").

223, 229 (Minn. Ct. App. 2014), *review denied* (May 28, 2014) ("subdivision 7 [of Minn. Stat. § 124D.10] should . . . be read to prohibit duties and liabilities imposed on schools, school boards, and school districts from automatically applying to charter schools," but not read to exclude charter schools' "eligibility for program funding and operation, which is a benefit and not a duty or liability").

The following subdivision then "lists the duties and obligations that do apply to charter schools." *Id.* at 229 (citing Minn. Stat. § 124D.10, subd. 8). That subdivision includes one provision which the Court deems particularly significant here, that "[a] charter school is a [school] district for the purposes of tort liability under chapter 466." Minn. Stat. § 124D.10, subd. 8(k). Chapter 466 states that "[s]ubject to the limitations of sections 466.01 to 466.15, every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." Minn. Stat. § 466.02. The chapter defines "municipality" as "any city . . . , any county, town, public authority, public corporation, . . . , special district, school district, however organized." Minn. Stat. § 466.01. Thus, rather than seeking to keep charter schools within the protection of the state's sovereign immunity, Minnesota Statutes leave charter schools open to the same tort liability as all other political subdivisions and municipal entities, at least with respect to state court actions.[8] The Court finds it instructive for the degree of

---

[8] Although not necessary for the Court's reliance on this subdivision – which indicates generally that the state does not intend for charter schools to benefit from any sort of liability immunity – the Court observes that claims under the False Claims Act, which are fairly categorized as fraud claims, would likely be considered torts for the purposes of this subdivision.

(Footnote continued on next page.)

control aspect of Eleventh Amendment immunity analysis that Minnesota Statutes indicate that the State of Minnesota intended for charter schools to be treated for the purposes of tort liability like school districts, which are not entitled to Eleventh Amendment immunity and are "persons" under the FCA.

Turning to the question of whether any judgment against Defendants would be paid with state funds, the Court finds persuasive on this issue the reasoning in *TiZA*, that, because the plaintiffs sought equitable reimbursement to the state of funds that the charter school had received, the lawsuit could not result in expenditures from the state's funds. Defendants argue that this argument and reliance on *TiZA* ignores the fact that most of charter schools' funds originate from the state treasury so, "unless the judgment is covered under an insurance policy, the judgment is paid for with money that has been received from the state treasury," and thus, "whether a charter school uses its own money to satisfy a judgment, or has to close because it cannot satisfy a judgment, the source of those funds is the treasury of the State of Minnesota."  (Defs.' Reply at 14-15, Mar. 17, 2014, Docket No. 46.)  But courts have consistently held in the context of school districts that the receipt of state funds do not transform districts into arms of the state, even when they account for substantial portions of the district's budget.  *See, e.g.*, *Fay v. S. Colonie Cent. Sch. Dist.*, 802 F.2d 21, 27 (2d Cir. 1986) ("being a steward of state education policy does not make the school district an alter ego of the state" and "the school district

_____

(Footnote continued.)

*See Florenzano v. Olson*, 387 N.W.2d 168, 172 (Minn. 1986) (considering the difficulty of defining fraud as being based on a theory of either deceit or negligence and citing Prosser on Torts, W. Prosser, Law of Torts § 105 (4th ed. 1971)).

has not established that payment of money damages to Fay will come directly from the state treasury"), *overruled on other grounds by Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002); *Blackburn v. Floyd Cnty. Bd. of Educ. By & Through Adams*, 749 F. Supp. 159, 163 (E.D. Ky. 1990) ("The Eleventh Amendment does not apply simply because the local board receives a substantial part of its financing from state funds.").   Although Defendants argue that, unlike school districts, nearly all of their funding originates with the state, Plaintiffs allege that forty percent of charter school funding is federal special education funding routed through local school districts. (Compl. ¶ 1.)  Taking this allegation as true, the Court finds that charter schools' funding structure is not so dependent upon the state that the funding factor requires a conclusion that charter schools are an arm of the state.[9]  Furthermore, the possibility of an entity's ultimate dissolution having consequences for the state does not necessarily warrant affording the entity immunity.  *Cf. Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1146 (3d Cir. 1995) ("Nor is our conclusion with respect to the funding factor altered by the fact that the Commission will one day be dissolved and all its remaining funds and property vest in the Department of Highways.").   The Court thus concludes that the

---

[9] The Court notes that the Eighth Circuit has indicated that where 58% of community college's budget was paid for with state funds and the "state treasury is structured to include a Fund" for the community college that is dedicated to the "maintenance, operation, and improvement" of the community college, the community college was an arm of the state. *Hadley*, 76 F.3d at 1440 ("NACTC is, both financially and institutionally, an arm of the State, and that any damage award to Hadley would inevitably be paid from the state treasury").  There, in addition to the portion of the community college's funds originating from the state, the court found relevant the fact that the state treasury retained a special fund for the community college. There does not appear to be a comparable arrangement for charter schools; instead, they receive funds based on attendance and other reports in a manner similar to traditional school districts.

funding inquiry of Eleventh Amendment analysis does not require a determination that charter schools are entitled to Eleventh Amendment immunity.

As a final note, the Court observes that concluding that charter schools are arms of the state would have the effect of immunizing charter schools from suit under 42 U.S.C. § 1983 – the primary means by which students, parents, teachers, or other employees could assert claims for violations of constitutional or federal statutory rights. School districts may be – and frequently are – sued under 42 U.S.C. § 1983, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 695-700 (1978) (in overruling *Monroe v. Pape*, 365 U.S. 167 (1961), discussing how that case's bar on § 1983 actions against municipalities was inconsistent with the long practice, including desegregation cases, of permitting actions against school districts under § 1983), but states are immune from suit under that statute, *see Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that neither state nor its officials acting in their official capacities were "persons" under § 1983). The Ninth Circuit has held that an Arizona charter school was not a state actor for the purposes of § 1983 – suggesting even less of a nexus or connection between charter schools and states. *See Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806 (9th Cir. 2010). The Eighth Circuit has affirmed summary judgment on a § 1983 claim against a charter school without questioning whether the charter school could be considered a state actor, *see Fister v. Minnesota New Country Sch.*, 149 F.3d 1187 (8th Cir. 1998) (unpublished table opinion) and most other courts to address the issue have concluded that charter schools are state actors, and thus subject to liability under 42 U.S.C. § 1983, *see, e.g.*, *Riester v. Riverside Cmty. Sch.*, 257

F. Supp. 2d 968, 972 (S.D. Ohio 2002); *Daugherty v. Vanguard Charter Sch. Acad.*, 116 F. Supp. 2d 897 (W.D. Mich. 2000); *Am. Civil Liberties Union of Minnesota v. Tarek Ibn Ziyad Acad.*, Civ. No. 09-138, 2009 WL 2215072 (D. Minn. July 21, 2009); *Jordan v. N. Kane Educ. Corp.*, Civ. No. 08-4477, 2009 WL 509744 (N.D. Ill. Mar. 2, 2009); *Scaggs v. New York Dep't of Educ.*, Civ. No. 06-0799, 2007 WL 1456221 (E.D.N.Y. May 16, 2007); *Matwijko v. Bd. of Trustees of Global Concepts Charter Sch.*, Civ. No. 04-663A, 2006 WL 2466868 (W.D.N.Y. Aug. 24, 2006).[10]  To conclude that charter schools are an "arm of the state," would immunize charter schools from § 1983 liability and run counter to this line of cases indicating that individuals may use § 1983 to assert constitutional rights against charter schools.

The Court concludes that charter schools in Minnesota are not so controlled by the state, nor is it clear that any judgment against a charter school would come directly from the state's treasury, that they should be treated as arms of the state for the purposes of Eleventh Amendment immunity.  The Court therefore concludes that charter schools are fairly encompassed within the term "person" in the FCA.

### C.    Minnesota False Claims Act

Plaintiffs also bring a claim under the Minnesota False Claims Act, which makes a "person . . . liable to the state or the political subdivision" if the person, among other

---

[10] *See also* Maren Hulden, *Charting A Course to State Action: Charter Schools and § 1983*, 111 Colum. L. Rev. 1244, 1267 (2011) (taking inventory of cases to have address state action with regard to charter schools and observing that "[w]ith the exception of *Caviness*, all of the cases have found the charter school action at issue to be state action").

things, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" or "knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  Minn. Stat. § 15C.02.  As with the Plaintiffs' federal FCA claim, Defendants argue that they are not a "person" under this statute and thus cannot be held liable.

Unlike the federal FCA, the Minnesota FCA includes a definition of "person," which is that "'[p]erson' means a natural person, partnership, corporation, association or other legal entity but does not include the state or a political subdivision."  Minn. Stat. § 15C.01, subd. 5.  The statute also defines "political subdivision" as meaning "a political subdivision of the state and includes a department or agency of a political subdivision." *Id.*, subd. 6.  As of yet, there is no case law from Minnesota courts interpreting these provisions of this statute.

Looking to the use of the term "political subdivision" in other contexts, the Minnesota Statutes frequently treat "political subdivision" as including traditional school districts.  *See* Minn. Stat. § 3.986, subd. 4 (in statute governing local fiscal impacts, defining "political subdivision" as "a school district, county, or home rule charter or statutory city"); Minn. Stat. § 6.465, subd. 2 (in statute governing state auditor, defining "political subdivision" as "a county, home rule charter or statutory city, town, school district, metropolitan or regional agency, public corporation, political subdivision, or special district as defined in subdivision 3"); *see also* Minn. Stat. § 211A.01, subd. 6 (in statute governing elections, defining the term "disbursement" as excluding "payment by a county, municipality, school district, or other political subdivision for election-related

expenditures required or authorized by law."); Minn. Stat. § 466.01, subd. 1 (in statute governing tort liability, defining "municipality" as "any city . . . , county, town, public authority, public corporation . . . , special district, school district, however organized . . . , other political subdivision . . . ."). Courts have also found, or assumed, school districts to be "political subdivisions" as used in the context of other Minnesota statutes. *See, e.g.*, *Anderson v. Indep. Sch. Dist.*, 357 F.3d 806, 810-11 (8th Cir. 2004) (Minnesota Government Data Practices Act, Minn. Stat. § 13.05, subd. 4); *Washington v. Indep. Sch. Dist. No. 625*, 610 N.W.2d 347, 349 (Minn. Ct. App. 2000) (same); *see also Haddad v. Indep. Sch. Dist. No. 272, Eden Prairie*, C3-98-1128, 1999 WL 107738 (Minn. Ct. App. Mar. 2, 1999) (relying on a case that held that "estoppel cannot be invoked to confer governmental power upon a political subdivision when that power is otherwise lacking" to reject teacher's argument that she acquired tenure rights on the basis of estoppel).

In light of these indications from other authorities on Minnesota law, the Court concludes that school districts are properly considered "political subdivisions" for the purposes of the MFCA. Whether charter schools are "political subdivisions" for the purposes of the statute, however, is in even less charted waters. Plaintiffs do not address this issue. Looking again to the charter school statute, which states that a charter school is a "district for the purposes of tort liability," the Court concludes that, without further guidance from Minnesota courts or the legislature or argument from Plaintiffs, because a charter school is a school district for tort liability and school districts are likely "political subdivisions" under Minn. Stat. § 15C.01, subd. 6, that charter schools too are properly deemed "political subdivisions" under that section. Although the Court can imagine

reasons that charter schools would not be "political subdivisions" for the purposes of the MFCA, Plaintiffs have not presented any here. Because Minnesota courts and statutes indicate that school districts would likely be "political subdivisions" under the MFCA and the charter school statute treats charter schools the same as school districts for purposes of tort liability, the Court concludes that charter schools are "political subdivisions" under the MFCA and are thus excluded from the MFCA's definition of "person." For this reason, Plaintiffs cannot state a claim against Defendants under the MFCA. The Court will dismiss this claim and does not address Defendants' arguments that Plaintiffs failed to adequately allege this claim .

### D.       ADEQUACY OF PLAINTIFFS' ALLEGATIONS UNDER THE FCA

The Court turns to the merits of Plaintiffs' FCA claim. The FCA subjects to liability "[a]ny person" who, among other things, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). Defendants argue that Plaintiffs fail to state a claim because they have not adequately pled how any of Defendants' actions amounted to a "claim for payment or approval." 31 U.S.C. § 3729(a). They argue that, because federal special education funding is distributed to school districts in block grants, and only then is passed along to charter schools on a per-student basis, that the contents of charter school students' IEPs – which Plaintiffs allege Defendants fraudulently manipulated to indicate more time spent with students than actually occurred – do not and could not result in greater payments or benefits being conferred upon Defendants. A complaint under the FCA "must plead such facts as the

time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, --- F.3d ---, No. 13-1654, slip op. at 4 (Aug. 29, 2014).   The Court concludes that Plaintiffs' complaint does not adequately allege how Defendants' actions amounted to a false claim for payments or benefits.   Specifically, the Court notes that the allegations do not clearly explain how the relevant funding mechanisms operate and how the allegedly falsified documents and other reports relate to those funding mechanisms. Because these deficiencies are ones which could possibly be cured by more specific or clear allegations, the Court will dismiss Plaintiffs' claims under the False Claims Act without prejudice.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss [Docket No. 34] is **GRANTED** as follows:

1.    Counts I and II are **DISMISSED without prejudice**.

2.    Count III is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:   September 29, 2014          _____s/ John M. Tunheim_____
at Minneapolis, Minnesota.                     JOHN R. TUNHEIM
                                         United States District Judge